96 F.3d 1223
 96 Cal. Daily Op. Serv. 7098, 96 Daily Journal
D.A.R. 11,619
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael David HUBBARD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Ray LYON, Defendant-Appellant.
 Nos. 95-10317, 95-10318.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 14, 1996.
Decided Sept. 23, 1996.
 
 Caro Marks, Arthur W. Ruthenbeck, Assistant Federal Defenders, Sacramento, CA, for defendant-appellant Michael Hubbard.
 Dwight M. Samuel, Sacramento, CA, for defendant-appellant James Lyon.
 Jeffrey B. Chasnow (argued), Kenneth L. Jost, Peter Ainsworth, Angela Gunter (on the brief), United States Department of Justice, Office of Consumer Litigation, Washington, DC, for plaintiff-appellee United States.
 Appeals from the United States District Court for the Eastern District of California, Lawrence K. Karlton, District Judge, Presiding. D.C. No. CR-93-00473-LKK.
 Before WIGGINS and TROTT, Circuit Judges, and VANCE, District Judge.*
 TROTT, Circuit Judge:
 
 OVERVIEW
 
 1
 Michael Hubbard and James Lyon were convicted of conspiracy to commit mail fraud related to an elaborate scheme of odometer tampering. They appeal the district court's denial of their Motion for Judgment of Acquittal, arguing (1) that there was insufficient evidence to support a charge of conspiracy, (2) that there was no "mailing" to bring their conduct within the mail fraud statute, (3) that there was no showing of specific intent to defraud by use of the mails, and (4) that the district court's partial judgment of acquittal on the charge of conspiracy to engage in odometer tampering was inconsistent with its denial of the motion for judgment of acquittal on the charge of conspiracy to engage in mail fraud. We reject Appellants' arguments and affirm the convictions.
 
 BACKGROUND
 
 2
 Michael Hubbard, conducting business as Discount Rent-A-Car (Discount) and as AAA Rent A Car, was in the business of purchasing and selling used motor vehicles. He purchased vehicles that had previously been rental cars, and when he purchased them they generally had between 50,000 and 80,000 miles on them. On some of the vehicles Hubbard purchased, he rolled back the odometers. Then, Hubbard applied to the Departments of Motor Vehicles in California and Texas for duplicate titles, claiming that the original titles to the purchased rental cars had been lost. The duplicate titles came back with a blank mileage figure, and the rolled-back, low-mileage figure was inserted on the duplicate title. The cars that are the subject of this case were then sold by Hubbard and his employee James Lyon to Arizona Checker Sales, which converted the used cars into taxicabs. Hubbard and Lyon represented to Arizona Checker Sales that the low-mileage figures on the odometers were accurate. Once Arizona Checker Sales had possession of the vehicles and their titles, they had to obtain new Arizona titles. The State of Arizona mailed the new titles back to Arizona Checker Sales.
 
 
 3
 In February 1995, Hubbard and Lyon were tried for conspiracy to engage in odometer tampering and mail fraud. At the conclusion of the Government's case, Hubbard and Lyon moved for judgment of acquittal. The district court denied the motion as to the conspiracy to commit mail fraud, but granted the motion as to the charge of conspiracy to engage in odometer tampering. The court found that the evidence did not show conspiracy to spin odometers, reasoning that the odometer tampering crime was completed once the odometer was altered, and there was no evidence that Lyon had actually altered an odometer. The court, however, found that Lyon's role in keeping records and negotiating with purchasers could support the charge of conspiracy to commit mail fraud.
 
 
 4
 After eight days of trial, a jury convicted Hubbard and Lyon on the count of conspiracy to commit mail fraud. Hubbard was sentenced to imprisonment of 30 months and 36 months supervised release. Lyon was sentenced to 24 months imprisonment and 36 months supervised release. Also, Lyon's supervised release in another jurisdiction was revoked, and he was sentenced to an additional seven months to run consecutively with the sentence in this case. This appeal followed.
 
 STANDARDS OF REVIEW
 
 5
 When reviewing a challenge to the sufficiency of the evidence, this court determines whether, after reviewing "the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); see also United States v. Vgeri, 51 F.3d 876, 879 (9th Cir.1995). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." United States v. Jackson, 72 F.3d 1370, 1381 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1546, 134 L.Ed.2d 649 (1996). The reviewing court must respect the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. United States v. Goode, 814 F.2d 1353, 1355 (9th Cir.1987).
 
 DISCUSSION
 
 6
 * Sufficient Evidence of Conspiracy
 
 
 7
 To prove a conspiracy, the Government must show an agreement between two or more persons to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose. United States v. Monroe, 552 F.2d 860, 862 (9th Cir.), cert. denied, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1069 (1977). "[I]nferences of the existence of such an agreement may be drawn 'if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.' " United States v. Melchor-Lopez, 627 F.2d 886, 890 (9th Cir.1980)(quoting Monroe, 552 F.2d at 862-63). "The agreement need not be explicit, but may be inferred from circumstantial evidence." Id. at 891. Once evidence of a conspiracy is established, only a slight connection between the defendant and the conspiracy is necessary to convict the defendant of knowing participation in the conspiracy. Id.; United States v. Aichele, 941 F.2d 761, 763 (9th Cir.1991). However, mere association with members of a conspiracy or knowledge of the conspiracy, "without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator." Melchor-Lopez, 627 F.2d at 891. Appellants do not attack the existence of fraudulent behavior. Instead, they argue that there is no evidence that Hubbard and Lyon had an agreement to act fraudulently.
 
 
 8
 We find, however, that the evidence presented at trial shows otherwise. Hubbard's role in the fraud is supported by the fact that he was running the company, negotiating the purchase and sale of vehicles, and picking up and delivering vehicles. One witness, a former employee of Discount, testified that she specifically saw him inside of one vehicle with the dashboard panel removed, adjusting the odometer with a screw driver. Also, Hubbard signed several documents related to the purchases and sales of the vehicles. For example, he applied for the duplicate titles, claiming that the originals were lost. During the execution of a search warrant at Discount, the titles purportedly lost were found on Hubbard's desk. Further evidence of Hubbard's intent and knowledge of the crime came from his prior conviction in June, 1990, when he pleaded guilty to two felony counts for odometer-fraud related crimes.
 
 
 9
 Appellants argue that even if there was evidence that Hubbard defrauded purchasers, the evidence does not show that Lyon knew that the mileage he represented to buyers was not accurate. However, there is sufficient evidence supporting Lyon's knowledge of and participation in the fraudulent scheme. Lyon spoke to purchasers of Discount's vehicles regarding the cost and mileage of the vehicles. For example, John Holshouser, a representative from Arizona Checker Sales, testified that he had spoken to Lyon 15-20 times over the phone about the cars that were for sale. Lyon also faxed to Holshouser documents listing vehicle prices and mileage. Holshouser specifically testified that Lyon had represented to him that the mileage figures were actual mileage figures. Holshouser also testified that he relied on mileage figures in deciding on the price he would pay for the car.
 
 
 10
 Lyon handled paperwork associated with both the purchase and sale of used cars. He personally maintained an inventory of the vehicles on a computer, inputting data about the mileage of the vehicles. Reports with vehicle information containing both high and low mileage figures for five vehicles were printed from the computer data kept by Lyon. A handwriting expert testified that Lyon had written at least some of the mileage figures on vehicle documents. For example, in relation to one vehicle, the expert testified that Lyon had written both: 1) a high mileage figure of 79,530 miles on a Dealer Jacket when Discount purchased the vehicle, and 2) the low mileage figure of 51,784 miles on the duplicate Texas Certificate of Title, which Discount provided to Arizona Checker Sales and which Arizona Checker Sales provided to the Arizona Department of Transportation. Also, in a fax to Holshouser, Lyon represented that the mileage on another vehicle was 30,100 miles, whereas the Dealer Jacket for the same vehicle states in Lyon's writing that the car has 70,550 miles.
 
 
 11
 Viewing the evidence in the light most favorable to the Government, the evidence shows that Hubbard purchased the vehicles with high mileage, rolled back the odometers, and then Hubbard and Lyon offered them for sale at a lower mileage. Lyon represented to Holshouser that the low mileage figures were accurate, and certified those low-mileage figures on title documents. Lyon input vehicle information into the company computer, and was in charge of maintaining the vehicle inventory. Hubbard and Lyon had to coordinate the new, rolled-back mileage figures to be consistent on vehicle price lists, on the duplicate titles, and on odometer disclosure statements. This scheme required their interaction and cooperation. Thus, a rational jury could have found a "concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose," which is sufficient to establish evidence of an agreement. See Melchor-Lopez, 627 F.2d at 890.
 
 
 12
 Accordingly, we conclude that a rational jury could have found that Appellants had an agreement to engage in this fraudulent scheme, and sufficient evidence supports the convictions for conspiracy.
 
 II
 Sufficient Evidence of Mail Fraud
 
 13
 A violation of the mail fraud statute involves: 1) existence of a scheme to defraud, and 2) using or causing the use of the mails in furtherance of the scheme. United States v. Stein, 37 F.3d 1407, 1408 (9th Cir.1994). Appellants contend that there was insufficient evidence to support a finding of the second element of the crime.[1] The second element requires that: 1) the defendant "cause the mails to be used"; and 2) the mailings be sufficiently closely related to the scheme. United States v. Shryock, 537 F.2d 207, 209 (5th Cir.1976)(quoting United States v. Maze, 414 U.S. 395, 399, 94 S.Ct. 645, 647-48, 38 L.Ed.2d 603 (1974)).
 
 
 14
 A. Mailing "Sufficiently Related to Scheme"
 
 
 15
 Appellants' threshold argument is that there was no "mailing" to bring their conduct within the mail fraud statute. The question is whether the mailing of Arizona titles from the Department of Transportation to Arizona Checker Sales, which occurred after Defendants sold the vehicles, satisfied this "mailing" requirement.
 
 
 16
 In order for the mailing to be "sufficiently closely related," it must be for the "purpose of executing the scheme," or "incident to an essential part of the scheme." Shryock, 537 F.2d at 209 (quoting Kann v. United States, 323 U.S. 88, 94, 65 S.Ct. 148, 150-51, 89 L.Ed. 88 (1944), and Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362-63, 98 L.Ed. 435 (1954)). Appellants argue that they did not use the U.S. mail in conducting their business or in executing the alleged fraudulent scheme. Instead, Appellants contend that they communicated with sellers and buyers of the used cars via fax, telephone, and private carriers such as Fed Ex, not through the U.S. mail. They argue that the use of the U.S. mails by the Arizona Department of Transportation to send the Arizona titles back to Arizona Checker Sales occurred after the object of the alleged scheme was completed, and that the mailing was not "sufficiently closely related" to the scheme. See United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974)(defendants engaged in unauthorized use of credit card; mailings of invoices to card owner for payment were not in execution of scheme because it was immaterial to defendants how the payments were obtained).
 
 
 17
 This argument fails under the Supreme Court case Schmuck v. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Schmuck involved a similar scheme whereby Schmuck purchased used cars, rolled back their odometers, and resold the vehicles to retail dealers for artificially inflated prices based on the low-mileage odometer readings. The cars were then resold to customers. After the sale, the retail dealers would submit a title application to the Wisconsin Department of Transportation on behalf of the buyer. The receipt of the Wisconsin title was a prerequisite for the transfer of title and for the customer's acquisition of Wisconsin tags.
 
 
 18
 Just as Appellants do here, Schmuck argued that the submission of the title application did not satisfy the mailing element of the mail fraud statute. The Supreme Court, however, disagreed, holding:
 
 
 19
 To be part of the execution of the fraud ... the use of the mails need not be an essential element of the scheme.... It is sufficient for the mailing to be "incident to an essential part of the scheme" ... or "a step in the plot."
 
 
 20
 Id. at 710-11, 109 S.Ct. at 1447-48 (citations omitted). The Court found that Schmuck was engaged in an "ongoing fraudulent venture," and held that:
 
 
 21
 A rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers.
 
 
 22
 Under these circumstances, we believe that a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title. Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him.
 
 
 23
 Id. at 711-12, 109 S.Ct. at 1448. Thus, the Court concluded that the mailing element of the mail fraud statute was satisfied.
 
 
 24
 Here, Hubbard and Lyon similarly engaged in an ongoing relationship with Arizona Checker Sales. In applying for Arizona titles, Arizona Checker Sales used the falsified mileage figures on the titles sent by Hubbard and Lyon. Although Hubbard and Lyon may not have directly used the U.S. mail to send falsified documents and titles, Arizona's mailing of new titles to Arizona Checker Sales would be "sufficiently closely related" to the fraudulent scheme if it was "incident to an essential part of the scheme" or "a step in the plot."
 
 
 25
 The district court properly left it to the jury to determine whether the mailings were part of the execution of the fraudulent scheme--i.e., whether Defendants' scheme did not reach fruition until Arizona Checker Sales' received the Arizona titles. See Schmuck, 489 U.S. at 712, 109 S.Ct. at 1448-49. The jury decided that the scheme was dependent on the mailing of the Arizona titles to Arizona Checker Sales, and convicted Hubbard and Lyon. The evidence showed that if Arizona Checker Sales had not been able to obtain the Arizona titles, they could not have used the vehicles as taxicabs. Thus, an inability to get the Arizona titles would have put an "abrupt halt" to Defendants' ongoing relationship with Arizona Checker Sales. See id.
 
 
 26
 In sum, we conclude that the mailing of the Arizona titles from the Arizona Department of Transportation to Arizona Checker Sales is analogous to the situation in Schmuck, where the retail dealers had to acquire Wisconsin titles for their retail customers. And, as in Schmuck, we find sufficient evidence to support the jury's determination that the success of the fraudulent scheme depended on the acquisition of the Arizona titles. Thus, there is sufficient evidence that the mailing was "sufficiently closely related to the scheme."[2]
 
 B. Intent Element of Mail Fraud
 
 27
 The Government also had to prove that Defendants "caused the mails" to be used in furtherance of their scheme. Hubbard argues that to meet the intent element of the crime, the Government must prove a specific intent by Defendants to commit mail fraud. This argument was rejected long ago by the Supreme Court in Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). There, the Court held that specific intent to use the mails is not necessary to prove a substantive charge of mail fraud. Instead, if the defendant "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." Id. at 8-9, 74 S.Ct. at 363; see also United States v. Bernhardt, 840 F.2d 1441, 1447 (9th Cir.1988). And, a federal conspiracy conviction does not require a greater level of criminal intent than a conviction on the substantive count. United States v. Feola, 420 U.S. 671, 696, 95 S.Ct. 1255, 1269-70, 43 L.Ed.2d 541 (1975); see United States v. Smith, 934 F.2d 270, 275 (11th Cir.1991)("putting Pereira and Feola together, it is clear that proof of a specific intent to use the mails is not required to show conspiracy to commit mail fraud").
 
 
 28
 As explained above, a rational jury could have found that the execution of Defendants' scheme relied on the acquisition of Arizona titles. Defendants were sophisticated players in the used car industry and had an ongoing relationship with Arizona Checker Sales. Arizona Checker Sales had to have Arizona titles in order to operate the vehicles as taxicabs. Therefore, Defendants would have known or reasonably could have foreseen that Arizona Checker Sales would have to apply for Arizona titles. It was also reasonably foreseeable that these titles would be sent by the Arizona Department of Transportation to Arizona Checker Sales via regular U.S. mail. The Department of Transportation and other state agencies do not generally send title documents by Fed Ex or by fax. Also, a title application specifically asks for a mailing address.
 
 
 29
 Accordingly, a rational jury could have found that the use of the U.S. mails was reasonably foreseeable. Thus, sufficient evidence supports the jury's finding that Defendants "caused" the mails to be used.
 
 III
 
 30
 Inconsistency of Partial Judgment of Acquittal
 
 
 31
 Finally, Defendants argue that the district court's grant of the motion for judgment of acquittal for the charge of conspiracy to engage in odometer tampering and the denial of the motion for the charge of conspiracy to engage in mail fraud were inconsistent. In other words, they contend that they could not have conspired to commit mail fraud without conspiring to roll-back odometers.
 
 
 32
 This argument has no merit. The district court interpreted the conspiracy charge related to odometer tampering in a narrow sense, finding that the crime of odometer tampering ended as soon as the odometers were rolled-back. The court found that there was insufficient evidence to support a finding that Lyon had tampered with the odometers. This was distinct from the charge of mail fraud. As explained above, there was sufficient evidence to support a finding that Hubbard and Lyon engaged in a fraudulent scheme to sell cars with the rolled-back odometers to Arizona Checker Sales at inflated prices. Both Hubbard and Lyon performed integral parts of this scheme by signing the relevant documents, inputting the rolled-back odometer figures on new titles, and representing the low-mileage figures as actual mileage to Arizona Checker Sales.
 
 
 33
 Therefore, although there may not have been evidence that Lyon himself altered the odometers, the conspiracy charge for mail fraud included acts beyond the actual alteration of the odometer. This additional fraudulent behavior--i.e., misrepresenting mileage figures and selling vehicles to purchasers who would have to acquire new titles--provided the basis for the charge of conspiracy to commit mail fraud. Thus, there was nothing inconsistent in the district court's partial judgment of acquittal.
 
 
 34
 Affirmed.
 
 
 
 *
 The Honorable Sarah S. Vance, United States District Judge for the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 Based on the same facts supporting the jury's finding of a conspiracy, sufficient evidence supports the finding of a "scheme to defraud," the first element of the offense. Appellants do not independently attack the first element. Instead, "assuming arguendo" that there was a conspiratorial scheme to defraud, they argue that there was insufficient evidence of the second element of mail fraud-"using or causing the use of the mails in furtherance of the scheme."
 
 
 [2]
 We reject Appellants' argument that this case is distinguishable from Schmuck and more analogous to the situations in Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944)(dummy corporation issued two checks to defendants; mailing of the cashed checks to drawee banks could not supply mailing element because the fraudulent scheme had reached fruition), and United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974)(defendants engaged in unauthorized use of credit card; mailings of invoices to card owner for payment were not in execution of scheme because it was immaterial to defendants how the payments were obtained). As noted by the Court in Schmuck, the mailings in those cases involved "little more than post-fraud accounting." 489 U.S. at 714, 109 S.Ct. at 1449. The instant case is analogous to the ongoing relationship and the use of the U.S. mail found in Schmuck