117 F.3d 388
 47 Fed. R. Evid. Serv. 417, 97 Cal. Daily Op.
Serv. 4495,
97 Cal. Daily Op. Serv. 5805,
97 Daily Journal D.A.R. 7474,
97 Daily Journal D.A.R. 9353
UNITED STATES of America, Plaintiff-Appellee,
v.
Clara Patricia ARTEAGA, also known as Melissa Sandoval,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jose Fernando ARTEAGA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carlos Alberto DAVILA-AGUDELO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jenny ARRANGO-LAVERDE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Beatriz RAMIREZ-CASTRO, Defendant-Appellant.
 Nos. 95-30018, 95-30038, 95-30042, 95-30051 and 95-30061.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 7, 1996.
Decided June 13, 1997.
As Amended on Denial of Rehearing July 23, 1997.
 
 Mervyn Hamburg, Department of Justice, Washington, DC, Steven Skrocki, Assistant United States Attorney, Anchorage, AK, for plaintiff-appellee United States of America.
 Dawn Reed-Slaten, Powell & Slaten, Anchorage, AK, for defendant-appellant Clara Patricia Arteaga.
 Scott A. Sterling, Jensen, Harris & Roth, Anchorage, AK, for defendant-appellant Beatriz Ramirez-Castro.
 Brent R. Cole, Marston & Cole, Anchorage, AK, for defendant-appellant Jenny Arrango-Laverde.
 John C. Pharr, Anchorage, AK, for defendant-appellant Carlos Alberto Davila-Agudelo.
 Richard Clem, Minneapolis, MN, for defendant-appellant Jose Fernando Arteaga.
 Appeal from the United States District Court for the District of Alaska; John W. Sedwick, District Judge, Presiding. D.C. Nos. CR-94-055-03-JWS, CR-94-00055-JWS, CR-94-00055-08-JWS and CR-94-055-05-JWS.
 Before GOODWIN, BRUNETTI and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 We travel the poorly-charted byways of the hearsay rule in a case where the trial judge--facing a barrage of defense objections--ruled that much of the prosecution's evidence could not be considered by the jury for the truth of the matters asserted.
 
 Background
 
 2
 Appellants Jose Fernando Arteaga and Jenny Arrango-Laverde were convicted of money laundering, 18 U.S.C. § 1956(a)(1)(A)(i), as part of a scheme in which proceeds of cocaine sales in Alaska were wired to California.[1] They challenge the sufficiency of the evidence against them. The record contains sufficient proof that Arteaga was involved in a conspiracy to sell cocaine; that any funds he wired to Laverde were proceeds of that operation; and that Laverde was aware that the money was "dirty."[2] It is not, however, clear that the defendants were involved in the transactions charged in the indictment. The government--inexplicably--offered no proof that the writing on the relevant documents was the defendants', nor did any witness place defendants at locations where the transfers were initiated or completed.
 
 
 3
 The evidence of the transactions consisted mainly of Western Union records, including a series of "to-send-money" forms. A "to-send-money" form, filled out by the customer at a Western Union counter, lists the sender's name, address and telephone number, the name of the intended recipient and, of course, the amount of money being wired. After the customer completes this form, a clerk enters the information into a computer for transmittal to the receiving location.[3] There the payee completes the left side of a "to-receive-money" form, entering the sender's name, the recipient's name and other information needed to identify the transaction. The clerk may or may not ask to see the recipient's I.D.,[4] and may or may not record identifying information in the spaces provided for that purpose on the right side of the form. To complete the transaction, the clerk issues a Western Union check, which the recipient can endorse and cash on the spot. Microfilm copies of the endorsed checks are retained by Western Union for five years.
 
 
 4
 Copies of two "to-send-money" forms were found in Arteaga's apartment on September 15, 1993; one indicated that $500 was sent from Carlos Torres (allegedly an Arteaga alias) to Linda Arce (allegedly an Arrango-Laverde alias)[5] earlier that day. See Figure 1.FIGURE 1
 
 
 5
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEA corresponding Western Union "to-receive-money" form lists the person who claimed the money as "Linda Arce" and her "I.D. presented" as "B4004156." See Figure 2.[6]
 
 FIGURE 2
 
 6
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 A Western Union computer printout verifies that the money was sent. See Figure 3.FIGURE 3
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 7
 In order to connect Laverde to the name Linda Arce, the prosecution introduced a facsimile of a valid California driver's license bearing Laverde's picture, the name "Linda Arce Fernandez" and the number B4004156. The prosecution also introduced the testimony of an apartment manager in Anchorage, together with a rental application[7] naming Linda A. Fernandez as co-applicant for an apartment. Fernandez's I.D. was listed as California driver's license number B4004156. Additionally, the manager identified Laverde as the person who called herself Linda Fernandez, and he testified that after renting the apartment, she lived there with Arteaga for about a week.
 
 
 8
 The government offered the Western Union "to-send-money" and "to-receive-money" forms into evidence. Defendants argued that customer-provided information on the forms was hearsay, not subject to any exception, and should be excluded.
 
 Hearsay
 
 9
 The notations on the forms appear to fit the definition of hearsay: they were out-of-court statements offered, at least initially, "for the truth of the matters asserted." For example, the statement "$500" on the form was offered to prove that $500 was sent.[8] The statement "Linda Arce" was offered to prove that Linda Arce--or someone calling herself Linda Arce[9]--received the money.
 
 
 10
 However, there are several theories under which the customer-provided information would not be hearsay under the Federal Rules. Most significantly, under Rule 801(d)(2)(A), a party's own statement, if offered against that party, is not hearsay; likewise, under 801(d)(2)(E), the statement of a party's co-conspirator, if made in furtherance of the conspiracy and offered against the party, is not hearsay.[10] Absent other objections, statements made by Laverde would therefore have been admissible against Laverde under 801(d)(2)(A) and against Arteaga under 801(d)(2)(E), and vice versa.
 
 
 11
 The district court did not seek shelter in Rule 801(d)(2).[11] Instead, it ruled that some portions of the Western Union records could be considered for their truth under the business records exception to the hearsay rule. Fed.R.Evid. 803(6). However, that exception is premised on the reliability of records that an employee has a business duty to keep; it does not permit introduction of statements made by customers unless the employee was responsible for verifying the statements. United States v. Ordonez, 737 F.2d 793, 805 (9th Cir.1984) (a document is not admissible as a business record if the source of information indicates a lack of trustworthiness); see also Fed.R.Evid. 803, Advisory Committee Notes to Paragraph 6 ("If ... the supplier of the information does not act in the regular course [of business], an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail."). Courts that have applied this principle to Western Union records have generally held that customer-supplied information on "to-send-money" forms, which is not verified, should be excluded, while information on "to-receive-money" forms, which generally is verified, should be admitted.[12]
 
 
 12
 Eventually, the court acknowledged the limitations of the business records exception and announced its intention to admit the evidence instead under the "catch-all" exception to the hearsay rule. Fed.R.Evid. 803(24). Since the "catch-all" exception applies only to statements that carry certain "guarantees of trustworthiness," id., which were missing here, this was another questionable decision.
 
 
 13
 Whether this ruling was correct, however, is moot, because the court--possibly to put wrangling over defendants' hearsay objections to rest--eventually informed the jury that it could not consider the customer-provided information on any Western Union forms for the truth of the matters asserted. The court stated:
 
 
 14
 The [hearsay] objection is overruled; however, I will admit the exhibit, which is now admitted, subject to a limiting instruction. As with the other exhibits in this series, ladies and gentlemen, it may contain information obtained from sources outside the Western Union system, which you may not consider for the truth of that information.
 
 
 15
 Because hearsay problems arise only when information is being considered for its truth, the judge's decision to admit the records under a hearsay exception, but not allow the jury to consider the key statements for their truth, was largely self-defeating.[13] Indeed, if a statement cannot be considered for its truth, no hearsay problem arises, and the judge need not invoke a hearsay exception to admit it.[14]
 
 
 16
 Nonetheless, the government, perhaps afraid of having the records excluded entirely, warmly embraced the court's instruction. The prosecutor assured the court: "Any of that information that is provided by the customer, we are not offering for the truth of the matter asserted." Later, the government repeated that it "has no objection to a limiting instruction as to ... all the Western Union documents that will be coming in." (emphasis added).
 
 
 17
 The government realized too late it was shooting its case in the foot. It now argues that the customer-provided information should have been admitted for its truth. See Government's Consolidated Brief at 36-37 (arguing that the forms and checks did qualify as business records); id. at 37 (arguing that "the information provided to the Western Union agent[§ was] admissible either as admissions of part[y]-opponents ... or statements of co-conspirators."). But any damage the government did to its case at trial cannot be undone on appeal. Although the judge's ruling may well have been unnecessarily broad (and the government's accession unnecessarily craven), it is a ruling we must live with. That is because we are limited to deciding whether the jury properly convicted on the evidence before it--and "properly" means following the judge's limiting instruction. See Fed.R.Evid. 105.[15] We could not--were we to determine that the judge unnecessarily curtailed the jurors' fact-finding--go back in time and reinstruct them. Nor can we retroactively inject information into the jurors' minds. The government's arguments why the statements should have been admitted for their truth cannot have any impact now that the trial record is closed.
 
 Sufficiency of the evidence
 
 18
 By restricting the uses to which the Western Union forms could be put, the judge effectively eliminated one problem, hearsay, and created another, sufficiency. Defendants argue that, without the ability to consider the customer-supplied information for its truth, the jury had no basis for convicting them of money laundering. Defendants suggest that, lacking the ability to consider the truth of the matters asserted on the forms, the jurors were reduced to treating the forms as so many blank pieces of paper. See Brief of Appellant Jose Fernando Arteaga at 10 (arguing that the evidence, stripped of its "truth value," proves only "that someone in Alaska sent money to someone in California.").
 
 
 19
 This is not quite so as there are a number of non-truth-related purposes for which out-of-court statements may be considered. Evidence scholars have labored mightily to categorize these uses. Three categories are particularly familiar: statements that function as legally operative conduct,[16] statements offered for "effect on hearer,"[17] and statements offered to impeach.[18]
 
 
 20
 A fourth, slightly more esoteric, category of non-hearsay uses is known--for lack of a catchier name--as "circumstantial evidence of state of mind."[19] This category is best illustrated by an example: After a safe is opened illegally, police search the defendant and find a piece of paper in his pocket reading "26-32-7," which the parties stipulate is the combination to the safe. At trial, the government offers the piece of paper as evidence that the defendant had the combination and, therefore, was in a position to open the safe. A hearsay objection is made--and overruled. After all, the words on the paper are not being offered for their truth; what the combination is is not an issue at trial. Rather, they are offered as circumstantial evidence that the defendant had the wherewithal to open the safe.
 
 
 21
 If, at a trial based on the safe-cracking example, the court were to rule that the words could not be introduced for their truth--as the district judge ruled with respect to the Western Union records in this case--the government's case would not suffer.[20] Nor, obviously, would the ruling require the jury to treat the slip of paper as if it were blank.
 
 
 22
 To the extent appellants argue that customer-supplied information on the Western Union forms was not admissible for any purpose or that the trial court erred by not redacting the forms to exclude the information, see Brief of Appellant Jenny Arrango-Laverde at 28 ("It was error to allow the jury to review these documents without at least redacting the unverified information."), they are overlooking the non-truth-related purposes to which the information may be put. Whether that information, limited to those purposes, was sufficient to convict is another problem, one we consider defendant-by-defendant.
 
 Jose Fernando Arteaga
 
 23
 Could a rational jury--reviewing the evidence in this case without considering customer-provided information for its truth--have connected Arteaga to the charged transactions? As in the safe-cracking hypothetical, a piece of paper was found in Arteaga's possession. True, it was not in his pocket (which would strongly support the inference that he knew its contents) but in his apartment (which supports the same inference a bit less strongly). And, as in the safe-cracking hypothetical, it is evidence that he had knowledge necessary to commit the criminal acts.[21] Since the name Linda Arce was an alias, proven by independent evidence to have been used by Laverde in a drug conspiracy, it is unlikely that anyone not involved in that conspiracy would have had knowledge of, or reason to use, that name. In other words, as in the safe-cracking example, the pieces of paper provided strong circumstantial evidence that the defendant had the knowledge necessary to commit the act, and, therefore, that he likely did commit the act.[22]
 
 
 24
 As to the other counts, for which the government did not find "to-send-money" forms in Arteaga's apartment, the inferential chain is more attenuated. Those counts were proven through internal Western Union records that bore names and addresses similar to those on the forms found in the apartment. Several give, as the sender's address, variants on Arteaga's address. Additionally, all the exhibits name as the recipient either "Linda Arce" or "Melissa Sandoval"--a pseudonym for co-defendant Clara Patricia Arteaga; on one form the sender changed the name of the recipient from "Linda Arce" to "Melissa Sandoval." The repetition of names and addresses[23]--with every form overlapping at least one other form in some respect--permits the inference that all the transfers were parts of a common scheme.[24] Having already inferred that Arteaga filled out the forms found in his apartment, the jury could have rationally concluded that Arteaga filled out all the forms and, therefore, that he initiated the transfers.
 
 
 25
 Certainly, the case against Arteaga is circumstantial. However, there is no rule against resting convictions on lengthy chains of circumstantial proof. No rule prevents a jury from "drawing an inference upon an inference." Fenner v. General Motors Corp., 657 F.2d 647, 650 (5th Cir.1981). The jury was entitled to connect a series of reasonable inferences in reaching a conclusion about Arteaga's conduct.
 
 
 26
 It is of course possible that the Western Union forms were left in Arteaga's apartment by some other person, with or without Arteaga's knowledge; it is possible that he filled out the forms believing Linda Arce was a real person or that he filled out the forms believing that Arrango-Laverde had some legitimate reason for using the name Linda Arce. The jury, however, was permitted to reject these possibilities and conclude that the forms were filled out by Arteaga based on his knowledge of the workings of a money laundering operation, and, consequently, that they were part of that operation. The case was not overwhelming, but it was sufficient.
 
 Jenny Arrango-Laverde
 
 27
 Laverde was convicted of five counts of money laundering. Count 25 charged her with receiving money from a "Carlos Ramires." Unlike the other counts in the indictment, which link Laverde to her co-defendants, Count 25 does not identify Ramires. The government now claims "Carlos Ramires" is an Arteaga alias. However, the defect in the indictment cannot be corrected post hoc. The conviction is VACATED.
 
 
 28
 Was there sufficient evidence to link Laverde to any of the remaining transactions in her indictment?[25] In answering this question, we distinguish between Count 14 (involving the "to-receive-money" form bearing Laverde's driver's license number) and Counts 11-13 (involving only internal Western Union records and copies of endorsed checks).
 
 Counts 11-13
 
 29
 The name Linda Arce (a known Laverde alias) appears as the intended payee on the internal Western Union records (largely repeating information provided by the sender). In addition, a Linda Arce signature appears on the backs of several of the checks associated with these counts. This would seem to link Laverde to the transactions, except that most of the information was customer-supplied. The court instructed the jury that no customer-provided information on any Western Union form could be considered for its truth.
 
 
 30
 Unlike the case of Arteaga, there is no non-truth-related purpose to which the evidence could properly be put. While the use of the name Linda Arce by the person who signed the checks could, like the combination in the safecracker's pocket, serve as circumstantial evidence of that person's state of mind, there is no proof that the person was Laverde. The signatures--unlike the "to-send-money" forms found in Arteaga's apartment--have not been linked to the defendant.[26] Without any such link, her convictions on these charges cannot stand.[27]
 
 Count 14
 
 31
 Here, the clerk who dispensed the funds recorded Laverde's driver's license number on the right side of the "to-receive-money" form. The clerk almost certainly copied the number from a license.[28] It was not, for purposes of the judge's limiting instruction, customer-supplied-information; therefore, it was properly considered for its truth.
 
 
 32
 Under these circumstances, the jury could have inferred that the money was received by someone presenting driver's license number B4004156. That license has a photo of Laverde. She was properly convicted on this count.[29]
 
 
 33
 No. 95-30018 AFFIRMED as to all counts.
 
 
 34
 No. 95-30038 AFFIRMED as to all counts.
 
 
 35
 No. 95-30042 AFFIRMED as to all counts.
 
 
 36
 No. 95-30051 AFFIRMED as to Counts 1 and 14; REVERSED as to Counts 11-13 and 25; REMANDED for resentencing. Each party will bear its own costs on appeal.
 
 
 37
 No. 95-300061 AFFIRMED as to all counts.
 
 
 
 [1]
 There were ten defendants; five--including Arteaga and Arrango-Laverde--appeal, raising many claims. We have considered and rejected the claims not explicitly addressed in this opinion
 
 
 [2]
 Under 18 U.S.C. § 1956(a)(1)(A)(i), the government has the burden of proving beyond a reasonable doubt that an individual knowingly conducted a financial transaction involving proceeds from an unlawful activity with the intent to promote that activity. United States v. Herron, 97 F.3d 234, 236 (8th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 998, 136 L.Ed.2d 877 (1997). A transfer of funds via Western Union is a financial transaction for purposes of the statute. See id. at 237. The government must show that the funds were proceeds of an unlawful activity--here, cocaine trade. However, the government need not trace the funds used in the wire transfers to specific drug transactions. Id.; see also United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir.1990)
 The government presented ample evidence that Arteaga was involved in a drug conspiracy. It is permissible to infer from this evidence, along with the lack of any evidence demonstrating a legitimate source of income, that the funds were drug proceeds. Herron, 97 F.3d at 237.
 In Laverde's case, accepting that drug proceeds were sent by Arteaga or others, the government need only prove that she received the money knowing it was "dirty."
 The government presented much evidence of contact between Laverde and her co-defendants. For example, the apartment manager testified that Laverde lived with Arteaga for at least a week; a proven Laverde alias appeared on the apartment application. Additionally, a phone number and pager number connected to Laverde appear in various note and address books found in the homes of several co-defendants. In fact, a pager code was written next to Laverde's phone number on a piece of paper found in co-defendant Davila's apartment. The government's expert testified that such pager codes are consistent with drug trafficking operations. A rational jury could have inferred that Laverde was aware of the drug operation conducted by her associates and worked to facilitate it.
 
 
 [3]
 The information is stored in a Western Union computer and can be printed out at any time
 
 
 [4]
 At the sending end, Western Union requires I.D. only for amounts above $10,000. At the receiving end, clerks generally ask for identification because if money is disbursed in error the agency must cover the loss. However, clerks are not required to ask for I.D
 
 
 [5]
 Given the mellifluous tones of her real name, it is safe to say that Jenny Arrango-Laverde became Linda Arce for other than esthetic reasons
 
 
 [6]
 The transaction represented by these forms was Count 14 of the joint indictment. Altogether, Arteaga was charged with 10 counts of money-laundering; Laverde with 5
 
 
 [7]
 The rental application was introduced as a business record, see Fed.R.Evid. 803(6), without a limiting instruction. The court held that the customer-provided information on the form was admissible against Laverde under Rule 801(d)(2)(A) (party-opponent statements). However, on cross-examination the manager revealed that he did not actually see Laverde complete the form and that her companion may have done so. Laverde then moved to have the statements on the form excluded. The court denied the motion, presumably because the statements, while no longer admissible under Fed.R.Evid. 801(d)(2)(A), were now admissible under 801(d)(2)(E) (co-conspirator statements). The court did not err by admitting the application, including the customer-provided information
 
 
 [8]
 See Michael H. Graham, Federal Practice & Procedure § 6701, at 377 (for hearsay purposes, "[t]he term 'assertion' includes both matters directly expressed and matters ... implicitly [asserted]")
 
 
 [9]
 The government argues that, because the names on the forms are pseudonyms,
 the [Western Union] documents were offered[ ] not to prove that the named senders sent funds to the named recipients, but that Arteaga or someone else sent money to Arrango-Laverde or Clara Patricia Arteaga. Therefore, the evidence did not constitute hearsay.
 Government's Consolidated Brief at 37.
 This argument misses the mark. Consider the "to-send-money" form reproduced as Figure 1; it contains a statement to the effect that "I'm Carlos Torres and I want to wire money to Linda Arce." The use of pseudonyms does not, contrary to the government's position, mean the statements could never be admitted for their truth.
 Imagine a case where Harry, calling himself John, meets Fred, a contract killer, and says, "I'm John. I murdered Judge Winston and now I want you to murder Judge Salem." The government seems to be claiming that the first half of the statement isn't hearsay because it's a statement that "I, John" committed the murder, and we know that isn't true. But the relevant assertion is that Harry (using a pseudonym at the time he made the statement) murdered Judge Winston. The falsity of one part of the assertion does not change the fact that the statement is being introduced, in significant part, for its truth.
 
 
 [10]
 For the statements to qualify under the party or co-conspirator exemptions, there must, of course, be evidence that they were made by the party or conspirator. See, e.g., United States v. Gil, 58 F.3d 1414, 1419-20 (9th Cir.) (for writings in a ledger to be admitted under Rule 801(d), there must be sufficient evidence to enable a jury to decide that the defendant authored the ledger), cert. denied, --- U.S. ----, 116 S.Ct. 430, 133 L.Ed.2d 345 (1995); United States v. Ordonez, 737 F.2d 793, 800-01 (9th Cir.1984) (handwriting expert could not identify author of ledgers; therefore ledgers could not be admitted as party admissions)
 
 
 [11]
 It may have been concerned about the foundational problems discussed in note 10 supra
 
 
 [12]
 As to "to-send-money" forms, see, e.g., United States v. Cestnik, 36 F.3d 904, 908-09 (10th Cir.1994), cert. denied, 513 U.S. 1175, 115 S.Ct. 1156, 130 L.Ed.2d 1113 (1995); United States v. Mitchell, 49 F.3d 769, 778 (D.C.Cir.), cert. denied sub nom. Campbell v. United States, --- U.S. ----, 116 S.Ct. 327, 133 L.Ed.2d 228 (1995). As to "to-receive-money" forms, see, e.g., United States v. McIntyre, 997 F.2d 687, 701-02 (10th Cir.1993)
 The problem of customer-supplied information can be analyzed as "hearsay within hearsay." In such "double hearsay" situations, each statement must qualify under some exemption or exception to the hearsay rule. If, for example, the customer-supplied information consisted of a public record satisfying the requirements of Rule 803(8), and the employee had a business duty to record it, each statement would be covered by its own exception and a hearsay objection would fail.
 
 
 [13]
 The judge could have meant to permit the jury to consider any non-customer supplied information for its truth. This would have made sense in regard to, inter alia, dollar amounts: Because a sane clerk would count the money handed to him before writing down (and wiring) that amount, this was not customer-provided information
 Much of the other non-customer-supplied information on the Western Union forms had no conceivable "truth value." The words "sender's name," for example, pre-printed on a "to-send-money" form, would be introduced not for their truth but for their "effect on hearer"--that is, for their effect on the person who filled out the form. (Specifically, they tell the sender where to write his name.)
 
 
 [14]
 See United States v. Parry, 649 F.2d 292, 295 (5th Cir.1981)("[W]henever an out-of-court statement is offered for some purpose other than to prove the truth of the matter asserted, the ... statement ... is not subject to attack as hearsay.")
 Freed from the hearsay web, the records still had to pass two other tests: the best evidence rules, Fed.R.Evid. 1001-07 (original documents should be introduced whenever possible), and the authentication rules, Fed.R.Evid. 901-02 (proponent of a document must establish that it is what he claims it to be).
 
 
 [15]
 Jurors are presumed to follow the court's instructions, see Zafiro v. United States, 506 U.S. 534, 540, 113 S.Ct. 933, 938-39, 122 L.Ed.2d 317 (1993), even erroneous ones. But see Garnatz v. Stifel, Nicolaus & Co., 559 F.2d 1357, 1362 (8th Cir.1977)(where judge's confusion was obvious, jury "quite properly ignored ... the trial court's erroneous instructions")
 
 
 [16]
 For example, the statement of a merchant that he is willing to sell 100 pounds of coffee for $300 may be legally operative as an offer; in an action on the contract, the "truth" of the statement is not at issue
 This type of statement is sometimes called a "verbal act." Fed.R.Evid. 801, Advisory Committee Notes to Subdivision (c).
 
 
 [17]
 For example, a man is sued for negligence after he knocks over a baby carriage in a theater lobby. He introduces evidence that he was running out of the auditorium because someone had yelled "Fire." Whether or not there was a fire (that is, the truth of the matter asserted) is not at issue; what matters is that the statement was made
 
 
 [18]
 If a witness says "X" on the stand, his out-of-court statement "not-X" impeaches him, whether X is true or not
 
 
 [19]
 Abbreviated CE/SM by those select few who have studied at the feet of U.C.L.A. evidence professor Ken Graham. See Kenneth Graham, Jr., Law Outlines: Evidence 9-8 to 9-9 (1994)
 
 
 [20]
 Some commentators would explain that finding the piece of paper on the defendant is the equivalent of finding dynamite or sandpaper in his possession; the piece of paper is simply another safe-cracking tool. True enough. That the piece of paper can be recognized as a tool only by reading its contents does not, under the CE/SM approach, render those contents hearsay
 
 
 [21]
 That the forms were found in Arteaga's apartment on the day the money was sent strengthens the inference that Arteaga was involved in the transactions
 In one regard, the inference here is stronger than in the safe-cracking example: Any number of people could have had copies of the combination, but here, only one person could have had the customer copy of a "to-send-money" form.
 
 
 [22]
 Of course, in the safe-cracking hypothetical, a crime had clearly been committed; the only question was whether the defendant was involved. The slip of paper was not evidence of the criminal act, merely of the defendant's involvement
 Here, the "to-send-money" form seems to be necessary evidence that a crime was committed. Or is it? Western Union's computer record showing that $500 was sent, and the "to-receive-money" form showing that Laverde received the $500, see p. 393 supra--neither of which depends on customer-provided information--establish that the transfer occurred. The recovery of the "to-send-money" form in Arteaga's apartment allows us to infer that he had the knowledge necessary to participate in the transaction, from which we can infer that he did participate in the transaction.
 It is true that only after Arteaga's role in the transaction is established can we infer that the drug proceeds were involved, but there is nothing improper about this kind of bootstrapping; whether or not a crime was committed often depends on the identity of the perpetrator. To give just one example: Whether a statutory rape was committed may depend on whether the government can prove that it was the 40-year-old defendant, and not his 15-year-old son, who had sexual contact with the complainant.
 
 
 [23]
 There was also a Western Union record sent under the name Fernando Arteaga--not an alias--that bears the same address as some of the forms attributed to "Carlos Torres."
 
 
 [24]
 Arteaga argues that these inferences should not have been argued to the jury because the overlaps are based on customer-provided information. However, using the information to establish commonalities does not require an inference as to truth. Indeed, false commonalities are more probative than true ones
 
 
 [25]
 Some of the evidence was obtained in a search of Laverde's apartment. Police obtained Laverde's consent to the search by telling her they were conducting a narcotics investigation. Laverde claims this limited the scope of her consent to narcotics. She also argues that documents taken from her apartment were not in plain view, because they had to be read to be recognized as evidence of money laundering. However, the evidence in question (a California driver's license--not the license discussed in the text above--plus two social security cards, a photograph of Laverde with several of her co-defendants and a letter from a health club) were redundant of evidence obtained from other sources. Therefore, we decline to address Laverde's scope-of-consent and plain view arguments; the evidence implicated could not have changed the outcome of the case
 
 
 [26]
 There is no evidence of her presence at Western Union on any of the relevant dates. She did tell police that she had in the past received money from Western Union but offered no specifics that could link her to particular transactions
 
 
 [27]
 Isn't the alias like a signature, belonging only to Laverde? Can't the jury infer that no one but Laverde would have written that name? No; a signature identifies a unique individual--a handwriting analyst can rule out any other signer with a high degree of certainty. The alias, by contrast, could have been used by anyone familiar with the scheme
 
 
 [28]
 Public records are covered by their own hearsay exception. See Fed.R.Evid. 803(8)
 
 
 [29]
 Laverde contends that if the evidence on the money laundering counts was insufficient then her conspiracy conviction must be overturned. Although we affirm one of Laverde's money laundering convictions, we address this contention:
 The federal drug conspiracy statute, 21 U.S.C. § 846, requires an agreement to accomplish an illegal purpose; the government need not introduce evidence of an overt act. See United States v. Shabani, 513 U.S. 10, 14-16, 115 S.Ct. 382, 385, 130 L.Ed.2d 225 (1994). Moreover, "[o]nce evidence of a conspiracy is established, only a slight connection between the defendant and the conspiracy is necessary to convict the defendant of knowing participation." United States v. Hubbard, 96 F.3d 1223, 1226 (9th Cir.1996).
 Again, we must view the evidence in the light most favorable to the government. See United States v. Vincent, 758 F.2d 379, 380 (9th Cir.1985). The government presented testimony of an apartment manager in Alaska connecting Laverde to Jose Arteaga, as well as considerable evidence that Laverde used at least two different aliases. Again, her name and number appear in documents located in several of her co-defendants' homes. Consistent with the government expert's testimony on drug dealers' modus operandi, a jury could have rationally believed that Laverde's trip to Alaska was made to help Arteaga relocate. When questioned by authorities about this trip, Laverde claimed she had never been in Alaska--evidence of consciousness of guilt. From all this evidence, a rational jury could have concluded that Laverde agreed to help facilitate the distribution of cocaine, whether or not she participated in any particular transaction.