139 F.3d 909
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES OF AMERICA, Plaintiff-Appellant,
v.
Daniel F. KELLINGTON, Defendant-Appellee.
 No. 96-30318.
D.C. No. CR-95-60103-01-MRH.
 United States Court of Appeals, Ninth Circuit.
 Decided Feb. 23, 1998.
Argued and Submitted January 7, 1998.
 
 Appeal from the United States District Court for the District of Oregon Michael R. Hogan, District Judge, Presiding.
 Before ALDISERT,** PREGERSON, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellee Kellington was convicted by a jury of a violation of 18 U.S.C. § 1512(b)(2)(B), "knowingly ... engaging in misleading conduct towards another person, with intent to cause or induce any person to alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." The district court granted his subsequent motion for a judgment of acquittal on the ground that there was "no direct evidence that the defendant knew about the proceedings that were scheduled to occur in Oregon at the relevant time or that [defendant] reasonably believed that these proceedings would occur."
 
 
 3
 The government appeals. We review de novo the evidence presented against the defendant in light most favorable to the government to determine whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Riggins, 40 F.3d 1055, 1057 (9th Cir.1994) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); United States v. Bahena-Cardenas, 70 F.3d 1071-72 (9th Cir.1995). Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.
 
 
 4
 We have jurisdiction over this timely appeal, and we reverse and remand for entry of judgment and for sentencing.
 
 
 5
 * A Favorable View of the Evidence
 
 
 6
 Kellington was dealing with a recently-jailed federal fugitive from Vermont named MacFarlane, convicted and on the run from a felony narcotics offense serious enough to engage the attention of United States marshals. A warrant had also been issued for his failure to appear. The fugitive MacFarlane was using the alias Parker, and had tried to convince the deputy marshals that they had the wrong man by showing them false identification in that name. Kellington knew on Saturday, March 19, 1994 that MacFarlane (1) had deceived him as to his identity and criminal background, (2) was on his way to a federal court hearing in just two days, on Monday, March 21, 1994. Kellington also knew that MacFarlane's immediate objectives in contacting Kellington were (1) to cause objects in an envelope to be destroyed "A.S.A.P.", and (2) to spirit money hidden under a mattress and in a brief case away from prying eyes and the acquiring hands of others.
 
 
 7
 Kellington's claim under oath that this combination of circumstances and revelations did not raise his "antennae", curiosity, or suspicions about MacFarlane's purpose was clearly disbelieved by the jury, and one can certainly understand why: on its face the claim is both difficult if not impossible to swallow, and demonstrably false.
 
 
 8
 First, Kellington was an experienced attorney licensed to practice law. Any attorney, no matter what the nature of his practice, would know better under these particular circumstances than to destroy documents and objects of a kind that might be evidentiary materials. Kellington admitted as much on cross examination. Certainly a prudent attorney would not take custody of a substantial quantity of money from its hiding place without leaving a receipt. Moreover, Kellington on direct examination claimed he "assumed" that the envelope he instructed to be destroyed was something personal: "It could have been a love letter ." Again, given the surrounding circumstances, such an inventive claim not only carries no convincing force, but it would understandably suggest rank dissimulation to a reasonable jury. Having just arrested a drug trafficker on a fugitive warrant police are not interested in love letters. At the very least, an honest and unwitting attorney would have wanted to know what he was causing to be destroyed for his fugitive client before putting the torch to it. Burning envelopes with contents unknown is not taught in American law schools.
 
 
 9
 When he contacted Young to give him instructions, Kellington interjected the idea that the "police" or someone "in authority" might interrupt Young's errand, which provides insight into Kellington's mind as to his understanding of MacFarlane's purpose. Kellington first used the word "police," not Young.
 
 
 10
 The evidence as a whole supports the conclusion that Kellington actively mislead the innocent agent Young as to the true nature of Young's mission on behalf of MacFarlane. In fact, Kellington's attorney so conceded to the district court. Kellington did so inter alia by omitting all salient facts about MacFarlane's request that would have caused an honest person to reject it, facts including the true identity, fugitive status, and drug involvement of MacFarlane. These careful omissions deliberately left Young with the false belief that he was on a benign errand and enlisted him into unwittingly accepting a precarious adventure. In addition, Kellington (1) calmed Young's concerns by telling Young he could not get in trouble if caught in the act, and (2) advised Young when asked how to destroy the documents to burn them. One asks rhetorically why Kellington would mislead Young as he did if his intent was as innocent as he now professes. Kellington did not even tell Young that Parker was really MacFarlane and continued to refer to him in talking to Young by his alias.
 
 
 11
 During their conversation, Young said to Kellington that "burning this thing, that sounds kind of--and getting these materials, it sounds kind of iffy, you know," but Kellington told him he had no cause to worry. The laymen Young's "antennae" were certainly up and his suspicions aroused by Kellington's disguised and incomplete explanation of these events, yet the jury was supposed to believe that the attorney's--who had all the pertinent facts--were not.
 
 
 12
 Later, Young told Kellington in a recorded conversation that the envelope contained "fake I.D." Kellington's immediate answer was "uh, huh." Kellington then asked Young if he had "heard from anybody about anything," and when told no, Kellington said, "See, you have no information except that ... you gathered up some of your employer's stuff." In its light favorable to the government, this is a cover story designed to obscure the truth and block information from reaching the authorities.
 
 
 13
 In a follow-up conversation after Young had told Kellington about the fake I.D. and nearly $20,000 in one-hundred dollar bills, Young said, "Maybe we'd just go to the cops, what do you think." Kellington's incriminating reply was, "Well, I don't think you have to do that...." Kellington even referred to the money as possible "ill-gotten gains" which may be subject to seizure. Such seizures require proceedings in court.
 
 
 14
 All of this evidence and the inferences fairly drawn from it shed considerable damaging light on Kellington's testimony that he did not know of an impending official hearing when he misled Young. But there is much more. Undermining Kellington's claim are his own recorded words to Young. Referring to MacFarlane, Kellington stated, "Yeah, he may be, if he has a court hearing on Monday he may just be gone to [sic] real soon after that." Given the testimonial record, Kellington not only knew of an upcoming federal court proceeding two days hence in connection with MacFarlane's recent arrest and fugitive status, but he can only have learned it from his client.
 
 
 15
 We respectfully believe that the district court's treatment of the word "if" in MacFarlane's words as "conditional" was not only mistaken, but overlooked the legal requirement that the defendant's words and evidence against him be measured at that stage of the proceedings in a light favorable to the government. See United States v. Goode, 814 F.2d 1353, 1355 (9th Cir.1987). To do otherwise is to deny the government of its entitlement to a trial by jury. The contextual import of Kellington's statement was not that there might not be a hearing, but that the result of one will surely be that MacFarlane will be extradited to another state, in Kellington's words, "gone." The direct evidence coming from Kellington's own mouth of his knowledge of an official proceeding with the manifest potential to send his client to another state to "face the charges"--MacFarlane's words to Kellington--is substantial and compelling.
 
 
 16
 Extradition is a well-known concept, not one hidden in the arcana of the legal profession. Even a layman defendant attempting to advance this interpretation of the evidence would have had a hard time selling it. In the light of the jury's verdict, it was clear error for the district court to cast Kellington's words--and indeed all of the evidence--in the light most favorable to him rather than to the government and to the jury's verdict.
 
 
 17
 It strains credibility well past the breaking point to assert that Kellington did not know and appreciate the connection between the immediate burning of documents and the fugitive federal court proceeding on Monday. Substantial and compelling evidence wholly undercut Kellington's contentions both in the trial court and on appeal. With all respect to Kellington, the choice he put to the jury was whether as MacFarlane's attorney he was acting temporarily as an automaton, or whether he had been caught red handed and was now peddling a desperate story. Kellington's version did not raise a reasonable doubt on the part of a single juror, and their verdict finds solid support in the record. We must respect the province of the jury to determine the credibility of witnesses, to resolve evidentiary conflicts, and to draw reasoned inference from the facts. United States v. Hubbard, 96 F.3d 1223, 1226 (9th Cir.1996).
 
 
 18
 REVERSED and REMANDED FOR ENTRY OF JUDGMENT AND FOR SENTENCING.
 
 PREGERSON, Circuit Judge, dissenting:
 
 19
 In Judge Hogan's twenty-three year career as a federal judge, this was the first time that he set aside in its entirety a jury's guilty verdict. He reached this conclusion after assessing the demeanor of the witnesses, including Kellington. He reached this conclusion after considering carefully the evidence that the government presented against Kellington, which was circumstantial. I dissent because a cold record is no substitute for the insight gained by an experienced trial judge in the heat of the trial.
 
 
 20
 A defendant's conduct may appear criminal on paper, even though listening to that defendant explain his or her behavior could convince one that the defendant acted foolishly or incompetently, but not criminally. Judge Hogan heard the evidence first-hand and gauged the demeanor of the witnesses when he determined that Kellington, whatever else he might have been, was no criminal. Because I respect his determination, I respectfully dissent.
 
 
 
 **
 The Honorable Ruggero J. Aldisert, Senior Circuit Judge for the Third Circuit, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts in this circuit except as provided by Ninth Circuit Rule 36-3