**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Daniel F. KELLINGTON,**
**Defendant–Appellee.**

**No. 98–30193.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1999

Filed July 7, 2000

---

Frank R. Papagni, Jr., Assistant United States Attorney, Eugene, Oregon, attorney for the plaintiff-appellant.

Norman Sepenuk and James L. Collins, Portland Oregon, attorneys for the defendant-appellee.

Before: FLETCHER, TASHIMA, Circuit Judges, and ISHII, District Judge.[1]

FLETCHER, Circuit Judge:

The United States appeals the district court's order granting defendant, Daniel Kellington, a new trial. Because we find no abuse of discretion in the district court's decision, we affirm and remand the case for re-trial.

## I. FACTUAL BACKGROUND

### A. Pre–Verdict Proceedings

Daniel Kellington is an experienced civil attorney from Medford, Oregon specializing in personal injury law and trusts and estates. In 1996 he was tried and convicted of obstruction of justice under 18 U.S.C. § 1512(b)(2)(B), and conspiracy to obstruct justice under 18 U.S.C. § 371, for conduct arising from his representation of a client over the course of a weekend during which the client was apprehended for being a convicted drug trafficker and longstanding federal fugitive operating under an assumed name. The following facts were adduced at trial.

On a Saturday afternoon in March 1994, Kellington received a call at his office from a United States Marshal indicating that one of his business clients, "Richard Parker," had been positively identified as a fugitive named Peter MacFarlane who was wanted on a warrant issued in the District of Vermont, and that MacFarlane was in jail and wished to speak with him.[2] Until

---

1. The Honorable Anthony W. Ishii, District Judge for the Eastern District of California, sitting by designation.

2. In September 1983, MacFarlane was convicted in the United States District Court for the District of Vermont of drug trafficking offenses and sentenced to fifteen years in prison. MacFarlane remained free on bond pending the outcome of his appeal, but he

absconded shortly before his conviction was affirmed. Two warrants for his arrest were issued, along with a federal indictment for failure to appear to commence his sentence. MacFarlane was a fugitive until his arrest in Applegate, Oregon, based on an anonymous tip. He called Kellington from jail on the day of his arrest.

that day, Kellington knew MacFarlane only as "Richard Parker" and had represented him over a period of six months in 1993 in a few matters connected with his business, Metalhead Boat Works.[3] Kellington told MacFarlane over the phone that he did not do criminal work, but MacFarlane asked to see him anyway regarding "some matters related to a boat business," and Kellington agreed to come to the jail.

Once at the jail, MacFarlane confirmed that "Parker" was an alias, that he owed time for a prior drug conviction back East, and that he planned to go back to face the charges. He then asked Kellington to pass instructions along to one of his employees, Norm Young, whom he could not contact directly because the marshals would not allow him to speak with anyone but his attorney. Kellington agreed, and MacFarlane wrote out a list of personal property he wanted Young to remove from his house and hold (including stereo equipment, files, a black attache case, money stuffed between the mattresses of his bed, a laptop computer, electronic organizers, and a boat). MacFarlane also wrote out instructions to Young to retrieve and destroy an envelope hidden in a chair in the bedroom and to meet with MacFarlane on Monday to discuss running Metalhead Boat Works in his absence.[4] Kellington read the list, discussed the priority of each task with MacFarlane, and entered numbers on the list reflecting MacFarlane's sense of urgency. The meeting lasted about ten minutes.

Kellington then took the list back to his office, called Young right away, and began reading him the instructions. When Young asked how he should destroy the envelope, Kellington suggested that he could burn it. Obviously concerned by the instructions in the list, Young asked why "Mr. Parker" was not making the call himself. Kellington simply responded that "Parker" was in jail, without mentioning either why he had been arrested or that "Parker" was actually Peter MacFarlane. At the end of the conversation, Young asked if he could get into trouble for executing the listed instructions and Kellington said no, but that he should certainly stop if he ran into the police or "somebody bigger than you." Reporter's Transcript ("RT"), Vol. II at 218.

Young went to MacFarlane's house that afternoon and began removing the listed items and loading them into a truck. After finding the envelope, he took it to the wood stove in the house and began burning the enclosed papers until he came across a New York State driver's license with MacFarlane's picture but the name "Branon." The name matched a name Young had seen on some of the "official looking" papers he had already burned and he decided to stop burning. He continued to load the other listed property, however, and drove home, pocketing the driver's license and the remaining identification papers for "Branon."

After showing the driver's license to a friend who also knew "Parker," discovering over $20,000 in cash in one of the bags he removed, and talking with his wife over the phone (who was the bookkeeper for "Parker's" business), Young decided to drive back to MacFarlane's house and return the property. When he came up the driveway he was accosted by federal marshals who had returned to the property to execute a search warrant. Young immediately handed over the "Branon" documents and told the marshals that he had been instructed by Kellington to remove the property from "Parker's" house and to destroy the contents of the envelope.

The next day, a Sunday, federal agents came to Young's house, recovered some of

---

3. The fees for these services came to less than one thousand dollars and Kellington was paid in full by December 1993.

4. The exact instruction with respect to the envelope read: "Chair in bedroom, right side of arm, envelope. Please destroy as soon as possible." RT III 151–52.

the cash Young had withheld, and arranged to have Young initiate a tape-recorded call to Kellington to confirm that Kellington had given him the list. Two calls were made during which Young informed Kellington that he found fake I.D.'s in the envelope he destroyed and that there were thousands of dollars in one of the bags he removed. Young falsely told Kellington that the I.D.'s were destroyed, and when Kellington asked whether he had "heard from anybody about anything," Young said no. Kellington advised Young that they should make an inventory, count the money, and that he would take possession of the small items such as the cash, the computer, and the electronic organizers.

At the prompting of federal agents, Young also asked Kellington whether they should go to the authorities and Kellington replied, "Well, I don't think you have to do that...." Govt. Trial Ex. 27 at 2. Instead, Kellington again assured Young that he was not in trouble and agreed to come to Young's house to pick up his client's property that night. He added that there was no indication that the money was tainted and that he had a duty to protect any of his client's untainted assets:

> I have a duty to my client to protect his assets that, that they can't get and when they.... If they, if somebody uh, come and, comes and says hey we're attaching that money because it's ill gotten gains or something.... Well then I have to turn it over to them, but in the meantime it's his money, and it's his money and he may need to defend uh, you know pay a lawyer.

*Id.* at 5. As Kellington left Young's house with the small items and cash that Young gave him, federal agents detained him.

Kellington and MacFarlane were tried together. Each was charged with obstructing justice by "knowingly ... engag[ing] in misleading conduct toward an-

other person, with intent to alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(b)(2)(B). Another count charged the two with conspiring to obstruct justice.

At trial, Kellington testified that he did not know or even suspect that the envelope contained potential evidence when he conveyed MacFarlane's request to Young, and that he did not learn anything about the envelope's contents until Young called him on Sunday.[5] As for the other items on the list, Kellington said that he simply assumed MacFarlane wanted his employee to secure his property and business assets since he would be away for a long time. When asked on cross-examination why he wasn't initially suspicious of MacFarlane's request to remove and destroy property— why he didn't ask MacFarlane more questions before passing the instructions on to Young—Kellington repeatedly conceded that in hindsight, he should have been more inquiring but that, at the time, he thought he was only helping MacFarlane deal with business matters and "none of the flags were up":

> [W]hen I went to the jail and talked with—with Richard, he was the same friendly person that he had been. He was going to go back and pay his debt. He wasn't going to fight it. Just too trusting, I'm sure. Looking back, I certainly would be more suspicious, but I wasn't suspicious at the time.

RT III 153. When asked on direct why he did not tell Young the nature of MacFarlane's offense (or that "Parker" was just an alias), Kellington replied that, as a matter of course, he does not disclose to third parties any information or problems he learns in confidence from his clients.

At trial, the court allowed Kellington to introduce the testimony of an expert on

---

**5.** Indeed, he testified that he assumed the envelope contained something personal, possibly a "love letter."

legal ethics, Peter Jarvis. He testified (a) that the duty of loyalty requires a lawyer to do what the client requests unless the lawyer knows the conduct to be illegal, (b) that because of the duty of loyalty, lawyers "tend to very strongly believe [their] clients," and, at least in the civil bar, lawyers "tend not, by and large, to be immediately suspicious of [clients] if they ask us to do things," RT II 180(c) that it would not be surprising for a civil lawyer to fail to immediately recognize a request to remove and destroy personal property as potentially illegal,[6] (d) that Kellington's conduct on Sunday was "completely covered in [Oregon State] Ethics Opinion 1991–105 ... [because] [i]f you come into possession of evidence that you know to be contraband or the instrumentality [or] fruit of a crime ... then you may retain it for a reasonable period of time for purposes of examining and testing," RT II 196, and (e) that while Kellington did not behave unreasonably given his specific experience and background, in hindsight, a prudent lawyer would have asked additional questions of MacFarlane on Saturday to determine whether he was asking to have potential evidence destroyed or removed.

The government presented its own expert, Sylvia Stevens, assistant general counsel for the Oregon State Bar. She agreed with Jarvis that "lawyers are entitled to take their clients somewhat at face value," that "the client is clearly the ... boss in the relationship," and that "you have to be pretty certain that your client is going to do something illegal or fraudulent before you are compelled to withdraw from the representation and not assist." RT II 204–05. However, she added that

competent representation of a client requires at least a minimal investigation of what it is you're being asked to do for your client. Not only to ensure that you can give the client competent advice about what the consequences of that requested act might be, but also because if the lawyer is being asked—as Mr. Kellington was here—to take some action on his own ... I think a prudent lawyer would ensure what the lawyer is doing is not going to expose the lawyer to any liability as well.

RT II 205. Thus while testifying that a lawyer would not have to distrust a client merely because he discovered that his client had been operating under an alias, Stevens opined that a request to destroy an envelope when the client is going to be in prison for a long time should "trigger inquiry." RT II 209.

Despite allowing this testimony, the court precluded the lawyers from making any "ethics type of argument" in their closings,[7] and immediately after the expert testimony, the court instructed the jury that the expert testimony was simply "background" information:

[T]he last witnesses have given their opinions as experts on a number of matters. To the—and I've allowed that to provide you with the background that I think may be appropriate to some of the decisions that you may have to make in this case. However, the law in this case comes from me. And I'll give you the

---

6. On this point, Jarvis testified:

When you have a lawyer who has been in private practice on the civil side—and Mr. Kellington has been for the better part of 30 years—it does not come as a surprise to me that in this context he did not immediately flash upon what I think would be known to you or to maybe others, that, by God, this is a—you know, I'm being asked to destroy evidence here.

RT II 189.

7. The judge ordered:

I am not—I don't want to give you the idea that I'm going to allow you to argue ethics law, however. I did allow these witnesses to testify because when the jury—when we—especially since we still had the issue of a *Jewell* instruction out there, I thought some background in this area was appropriate for a jury to have, so that they weren't continually in the dark. *But this is not a case on legal lawyer ethics. A crime has been charged and I'm not going to permit ethics type of arguments here.*

RT III 103 (emphasis added).

law later. The law doesn't come from the witnesses. The evidence from which you decide the facts comes from the witnesses. And so I'll provide you with definitive statements on the law before you deliberate.

RT II 210.

After the close of evidence, the court denied the government's request for a *Jewell* instruction, *see United States v. Jewell*, 532 F.2d 697 (9th Cir.1976), finding that the government failed to submit sufficient evidence that Kellington "purposefully contrived to avoid learning all of the facts in order to have a defense in the event of subsequent prosecution." RT III 196–97. According to the district court, "[t]he *Jewell* instruction is properly given only when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate ignorance. It is not enough that a defendant was mistaken, recklessly disregarded the truth, or negligently failed to inquire." RT III 196–97. The government therefore had to prove that Kellington *knew* he was participating in the concealment or destruction of objects useful to an official proceeding.

## B. Post–Verdict Proceedings

After the jury returned a verdict of guilty, Kellington moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, and for a new trial under Rule 33. The district court granted the motion for judgment of acquittal, noting it was the first time he had done so in his 23 years as a judge and reasoning that the government did not produce sufficient evidence that Kellington intended to make evidence unavailable for an official proceeding.[8] The court then denied Kellington's motion for new trial as moot without indicating, as Rule 29(d) requires, how the court would decide the motion if the acquittal were to be reversed on appeal.[9]

The government appealed the district court's entry of judgment of acquittal and a divided panel of this court reversed in an unpublished memorandum disposition. *United States v. Kellington*, 139 F.3d 909, 1998 WL 75695, at *1–3 (9th Cir. 1998) (*Kellington I* ). Viewing the evidence in the light most favorable to the government, the court reasoned:

Any attorney, no matter what the nature of his practice, would know better under these particular circumstances than to destroy documents and objects of a kind that might be evidentiary materials. . . . At the very least, an honest and unwitting attorney would have wanted to know what he was causing to be destroyed for his fugitive client before putting the torch to it. Burning envelopes with contents unknown is not taught in American law schools. . . .

It strains credibility well past the breaking point to assert that Kellington did

---

**8.** According to the district court: "The evidence supports inferences that the defendant acted carelessly, perhaps imprudently, and some might even venture stupidly, but not criminally. I don't think the Government proved the requisite criminal intent here." Sept. 24, 1996 RT 12. Specifically, the court focused on the absence of proof that Kellington intended to make any evidence unavailable for an "official proceeding," since MacFarlane had already been positively identified and he specifically told Kellington that he intended to return to Vermont and serve the time.

**9.** Rule 29(d) states:
If a motion for judgment of acquittal after verdict of guilty under this Rule is granted, the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed, specifying the grounds for such determination. If the motion for a new trial is granted conditionally, the order thereon does not affect the finality of the judgment. If the motion for a new trial has been granted conditionally and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. If such motion has been denied conditionally, the appellee on appeal may assert error in that denial, and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

not know and appreciate the connection between the immediate burning of documents and the fugitive federal court pro-·ceeding on Monday. Substantial and compelling evidence wholly undercut Kellington's contentions both in the trial court and on appeal.

*Id.* at \*1–3.[10] The court's mandate stated: "REVERSED AND REMANDED FOR ENTRY OF JUDGMENT AND FOR SENTENCING." *Id.* at \*3.

In *Kellington I,* neither party briefed or otherwise raised the district court's failure to enter a conditional ruling on the motion for new trial. Thus on remand, when Kellington· renewed his motion for new trial, the district court ordered the motion reinstated and granted it after briefing and an extended oral argument. The court found that it committed plain error at trial by (1) instructing the jury that the expert testimony was merely "background" information rather than evidence going to Kellington's intent, and (2) expressly prohibiting defense counsel from arguing in closing that Kellington's ethical obligations to his client negated his criminal intent. As the court concluded:

> After careful deliberation, including close scrutiny of the record, weighing the evidence, evaluating the credibility of the witnesses, and for the reasons discussed above, I believe taken together, the evidence convicting defendant Kellington of a violation of 18 U.S.C. § 1512(b)(2)(B) in conjunction with the · court's restrictions on closing argument preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred.

After the district court denied the government's motion for reconsideration, this appeal followed. The government now contends that the district court violated our mandate in *Kellington I* and Rule 29 by reinstating the motion for new trial. On the merits, the government argues that the district court abused its discretion in granting the motion. We have jurisdiction over this appeal .pursuant to 18 U.S.C. § 3731, and we affirm the district court's decision to grant a new trial.

## II. AUTHORITY TO REINSTATE THE MOTION FOR NEW TRIAL

### A. The Rule of Mandate

■ As a question of law, we review de novo a district court's compliance with the mandate of an appellate court. *See McBride v. PLM Int'l, Inc.,* 179 F.3d 737, 741 (9th Cir.1999); *United States v. Moore,* 131 F.3d 595, 598 (6th Cir.1997).

.In order to determine whether the district court had jurisdiction to reinstate Kellington's motion for new trial, we must first apply the rule of mandate. The government contends that the strict terms of our mandate in *Kellington I* ("reversed and remanded for entry of judgment and for sentencing") prohibited the district court from considering the motion for new trial. Kellington, on the other hand, contends that the district court had discretion to consider the motion, despite the terms of the mandate, since the prior appeal addressed only the judgment of acquittal and this court was not then aware of the mooted new trial motion.

■ According to the rule of mandate, although lower courts are obliged to execute the terms of a mandate, they are free as to "anything not foreclosed by the man-

---

**10.** The dissent, however, observed that the evidence against Kellington was largely circumstantial and that "a cold record is no substitute for the insight gained by an experienced trial judge in the heat of the trial." *Id.* at \*3. The dissent continued:

> A defendant's conduct may appear criminal on paper, even though listening to that defendant explain his or her behavior could

convince one that the defendant acted foolishly or incompetently, but not criminally. Judge Hogan heard the evidence first-hand and gauged the demeanor of the witnesses when he determined that Kellington, whatever else he might have been, was no criminal. Because I respect his determination, I respectfully dissent.

*Id.*

date," *Herrington v. County of Sonoma,* 12 F.3d 901, 904 (9th Cir.1993) (citation omitted), and, under certain circumstances, "[a]n order issued after remand may deviate from the mandate ... if it is not counter to the spirit of the circuit court's decision...." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1404 (9th Cir.) (citing *King Instrument Corp. v. Otari Corp.,* 814 F.2d 1560, 1563 (1987)), *cert. denied,* 510 U.S. 815, 114 S.Ct. 64 (1993).

 In the seminal case on the subject, *In re Sanford Fork & Tool Co.,* the Supreme Court emphasized that, in addition to the mandate itself, "[t]he opinion by this court at the time of rendering its decree may be consulted to ascertain what was intended by its mandate...." 160 U.S. 247, 256, 16 S.Ct. 291, 40 L.Ed. 414 (1895). The Court added that it is important, in determining "what was heard and decided" by the appellate court, to bear in mind the "settled practice" of courts with respect to the applicable substantive law. 160 U.S. at 256, 16 S.Ct. 291. Thus, in construing a mandate, the lower court may consider the opinion the mandate purports to enforce as well as the procedural posture and substantive law from which it arises. As the talismanic language from *Sanford Fork* makes clear, the ultimate task is to distinguish matters that have been decided on appeal, and are therefore beyond the jurisdiction of the lower court, from matters that have not:

> When a case has once been decided by this court on appeal, and remanded to the circuit court, *whatever was before this court, and disposed of by its decree,* is considered as finally settled. The circuit court is bound by the decree as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, *upon any matter decided on appeal;* or intermeddle with it, further than to settle so much as has been remanded.

*Id.* at 255, 16 S.Ct. 291 (emphasis added) (lower court free to grant plaintiff leave to amend on remand where case was "left open by the opinion and mandate of this court, and by the general rules of practice in equity").

In most cases, enforcing the mandate is uncontroversial because its terms are plain and they square both with the underlying opinion and the procedural history of the case. Under these circumstances, the lower court must execute the mandate without hesitation. However, as the First Circuit has observed, "[o]n remand, courts are often confronted with issues that were never considered by the remanding court." *Biggins v. Hazen Paper Co.,* 111 F.3d 205, 209 (1st Cir.), *cert. denied,* 522 U.S. 952, 118 S.Ct. 373, 139 L.Ed.2d 290 (1997). In such cases, "[b]roadly speaking, mandates require respect for what the higher court decided, not for what it did not decide." *Id.* (citing *Rogers v. Hill,* 289 U.S. 582, 587–88, 53 S.Ct. 731, 77 L.Ed. 1385 (1933); *Sierra Club v. Penfold,* 857 F.2d 1307, 1311–12 (9th Cir.1988); *Alter Fin. Corp. v. Citizens & Southern Int'l Bank,* 817 F.2d 349 (5th Cir.1987)).

In *Sprague v. Ticonic National Bank,* for instance, the lower court refused to consider the prevailing party's petition for attorney fees and costs on the ground that the mandate simply directed the court "to execute its original final decree," and therefore deprived the court of jurisdiction to entertain the petition. 307 U.S. 161, 164, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). Although cognizant of the "indisputable" proposition that a lower court must "carry the mandate of the upper court into execution," the Supreme Court stated that this

> leaves us still to consider whether the immediate issue now in controversy was disposed of in the main litigation and therefore foreclosed by the mandate. While a mandate is controlling as to the matters within its compass, on remand a lower court is free as to other issues. Certainly the claim for "as between solicitor and client" costs was not directly

in issue in the original proceedings by Sprague. It was neither before the Circuit Court of Appeals nor before this Court. Its disposition, therefore, by the mandate of either Court could be implied only if a claim for such costs was necessarily implied in the claim in the original suit, and its failure to ask for such costs an implied waiver. These implications are repelled by the basis on which such costs are granted.... We therefore hold that the issue in the instant case is sufficiently different ... that it was impliedly covered neither by the original decree nor by the mandates, and that neither constituted a bar to the disposal of the petition below on its merits.

307 U.S. at 168–69, 59 S.Ct. 777 (citing *Ex parte Century Indemnity Co.*, 305 U.S. 354, 59 S.Ct. 239, 83 L.Ed. 216 (1938); *Kansas City Southern Ry. v. Guardian Trust Co.*, 281 U.S. 1, 50 S.Ct. 194, 74 L.Ed. 659 (1930); *Sanford Fork*, 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895)); *see also Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (looking to whether post-mandate conduct of lower court was consistent "with either the spirit or the express terms of our decision").

■ Rule of mandate cases in this circuit are in accord. As we noted in *Nguyen v. United States*, "although the mandate of an appellate court forecloses the lower court from reconsidering matters determined in the appellate court, it 'leaves to the district court any issue not expressly or impliedly disposed of on appeal.'" 792 F.2d 1500, 1502 (9th Cir.1986) (quoting *Stevens v. F/V Bonnie Doon*, 731 F.2d 1433, 1435 (9th Cir.1984), and holding that mandate ordering entry of summary judgment in favor of defendant required district court to enter summary judgment but did not preclude court from allowing plaintiff to amend complaint immediately thereafter).[11]

■ Here, the motion for new trial was not before the *Kellington I* court. Only the judgment of acquittal was appealed and addressed by our decision. Moreover, there can be no implication that, in reversing the judgment of acquittal, the *Kellington I* court implicitly disposed of the merits of the motion for new trial. *See Sprague*, 307 U.S. at 168, 59 S.Ct. 777. As with any judgment for acquittal, the *Kellington I* court reviewed the sufficiency of the evidence in the light most favorable to the government. *See United States v. Alston*, 974 F.2d 1206, 1210 (9th Cir.1992) ("A judgment of acquittal is improper if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. In reviewing the district court's decision, we apply the same standard.") (citations omitted). A motion for new trial, by contrast,

11. *See also Edlin v. M/V Truthseeker*, 69 F.3d 392, 393 (9th Cir.1995) ("Arguably, our mandate here did not foreclose the district court's consideration of" prevailing party's motion, one year after mandate issued, for costs incurred during the appeal.); *United States v. Cote*, 51 F.3d 178, 181–83 (9th Cir.1995) (where mandate ordered convictions "reversed," retrials not prohibited by the absence of language in the mandate remanding to the district court); *Lindy Pen Co.*, 982 F.2d at 1404–05 (upholding district court's decision not to order an accounting and not to award damages even though mandate explicitly directed district court "to order an accounting and to award damages and other relief as appropriate"); *Caldwell v. Puget Sound Electrical Apprenticeship & Training Trust*, 824 F.2d 765, 767 (9th Cir.1987) (where mandate stated that "judgment for [plaintiffs], including back pay, costs, and attorney's fees, is REVERSED," without remanding or mentioning front pay award, district court acted "consistent with mandate" by assuming jurisdiction after entry of judgment and granting defendants restitution of front pay); *cf. Firth v. United States*, 554 F.2d 990, 994 n. 4 (9th Cir.1977) (quoting *Crane v. American Standard, Inc.*, 490 F.2d 332, 341 (2d Cir.1973), for proposition that a district court must carry out the mandate of a court of appeals, even if the mandate was in error; holding that lower court correctly refused to re-evaluate an issue thoroughly considered and disposed of in prior appeal).

is reviewed for abuse of discretion on appeal, and "[a] district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Id.* at 1211 (citations and internal quotation marks omitted); *see also* Fed. R.Crim.P. 33 ("On a defendant's motion, the court may grant a new trial to that defendant *if the interests of justice so require.*") (emphasis added). Finally, nothing in *Kellington I* speaks to the district court's reasons for ordering a new trial on remand (improperly instructing the jury that the ethics experts' testimony was merely background and disallowing argument on that testimony in closing).

 Thus, considering our directive in *Kellington I* in light of the decision it purports to enforce as well as the underlying substantive law and procedural history, we conclude that the district court did not exceed its authority on remand by reinstating the motion for new trial.[12]

## B. Rule 29(d)

 The government also contends that the purposes of Rule 29(d) will be thwarted if a district court is permitted to consider a motion for new trial on remand where it initially failed to enter a conditional ruling. We disagree. Rule 29(d) was added to the Federal Rules of Criminal Procedure in 1986. *See* Criminal Law

---

12. *United States v. Cote,* 51 F.3d 178 (9th Cir.1995), on which the government relies, does not require a contrary result. *See supra* note 11. There the prosecution moved to retry two defendants after their convictions were reversed on appeal. "The district court concluded it lacked the authority to retry the defendants because the respective decisions and mandates directing the reversal of the defendants' convictions omitted an explicit order remanding the cases." *Id.* at 180. The mandates simply ordered the convictions "reversed." On appeal, we held that retrials were not prohibited by the absence of language in the mandate ordering remand. The government emphasizes our observation in dicta that "the district court could not entertain a proceeding inconsistent with the reversal of the defendants' convictions" since the mandate required reversal. *Id.* at 181. Our holding in *Cote* nevertheless tracks the traditional rule of mandate, according to which a district court is not required to woodenly follow a mandate's strict terms where patent injustice or absurdity would result. We held that, despite the absence of language of remand in the mandate, a second trial is within the district court's discretion "unless the reversing court indicates in its mandate or opinion that a retrial is prohibited because of double jeopardy or a similar infirmity...." *Id.* at 182. A party who believes the district court has misconstrued or failed to execute the mandate is not without a remedy. As the Supreme Court made clear in *Sanford Fork,* "either upon an application for a writ of mandamus or upon a new appeal, it is for [the appellate] court to construe its mandate, and to act accordingly." 160 U.S. at 256, 16

S.Ct. 291 (citations omitted). Indeed, this is precisely the course followed by the government in this appeal.

The dissent's view, that a district court must always woodenly follow the strict terms of a mandate, squares neither with the Supreme Court cases that developed the rule of mandate, nor with our precedent. *Cote* and *Lindy Pen* illustrate the point well. According to the dissent's view, the district court in *Lindy Pen* must have erred by disregarding our explicit direction "to order an accounting and to award damages," 982 F.2d at 1404–05 (discussed in note 11 *supra*), and the district court in *Cote* surely had no jurisdiction to order retrials because the mandate reversing the defendants' convictions included no remand. 51 F.3d at 181–82. But we held just the opposite in both cases *despite the plain terms of the mandate.* Although the dissent obviously prefers a less flexible rule, such as the one endorsed by the Fourth Circuit, *see* Dissent at 7371 (citing and quoting *Stamper v. Baskerville,* 724 F.2d 1106, 1107–08 (4th Cir. 1984), *cited in, Cote,* 51 F.3d at 181), our cases make clear that the rule of mandate is designed to permit flexibility where necessary, not to prohibit it. The dissent cites *Nguyen,* 792 F.2d at 1501–03, as holding otherwise, but that case simply proves the rule. No flexibility was necessary in that case because leave to amend (to add entirely new issues) could be allowed after following the mandate and entering summary judgment for the defendants. There was no dissonance, as there is here, between the procedural posture of the case and the mandate of our court.

and Procedure Technical Amendments Act of 1986, Pub.L. 99–646 § 54, 100 Stat. 3592, 3607. According to its terms, a district court errs if it fails to make a conditional ruling on a motion for new trial when it grants a judgment of acquittal. Fed.R.Crim.P. 29(d) ("If a motion for judgment of acquittal after verdict of guilty under this Rule is granted, the court *shall also determine* whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed, specifying the grounds for such determination.") (emphasis added). The purpose of requiring a conditional ruling is judicial economy: "Rather than have the judgment of acquittal and the grant of a new trial be reviewed separately by the appeals court, [Rule 29(d)] requires the district judge to make a conditional ruling concerning a new trial so that the appeals court can review these decisions in a single consolidated appeal." Richard Sauber & Michael Waldman, *Unlimited Power: Rule 29(a) and the Unreviewability of Directed Judgments of Acquittal*, 44 Am. U.L.Rev. 433, 437–38 (1994).

Compliance with Rule 29(d) is now well established in federal criminal practice. In the vast majority of cases where defendants file motions for acquittal along with timely motions for new trial, district courts know, or are promptly reminded by the parties, to enter conditional rulings on the latter. We deal here with the rare instance where, although the defendant timely moved for a new trial, the district court failed to enter a conditional ruling as the Rule requires, and neither party raised the error before the district court or on appeal of the judgment of acquittal.[13] The government urges that the defendant should be charged with the district court's error. However, the government raises the Rule 29(d) issue for the first time in this appeal, after the district court carefully considered the merits of the motion, heard argument from both parties, and determined that a serious miscarriage of justice may have occurred at Kellington's trial. *See United States v. Ghanayem*, 845 F.Supp. 565, 565–66 (N.D.Ill.1994) (upon deciding to appeal judgment of acquittal, *government* moved for conditional ruling on previously mooted motion for new trial), *rev'd on other grounds*, 48 F.3d 1438 (7th Cir.1995). Under these special circumstances, we decline to hold that the defendant, on pain of forfeiting his right to consideration of the merits of his motion, was obliged to raise the district court's initial failure to enter a conditional ruling.[14]

**13.** Given that the district court had never before granted a judgment of acquittal, it is likely that the court resorted to the pre-Rule 29(d) practice of mooting the new trial motion on the theory that it could be revived upon reversal of the judgment of acquittal. *See United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir.1985); *United States v. Ashfield*, 735 F.2d 101, 109 (3d Cir.1984); *United States v. Dixon*, 658 F.2d 181, 193 (3d Cir. 1981).

**14.** The purposes of Rule 29(d), it is important to note, are not thwarted by this conclusion. If in *Kellington I* either party had raised the district court's failure to enter a conditional ruling on the motion for new trial, we would still have had to remand to the district court for an initial assessment of the merits of the motion. And if the district court granted the motion, as it did here, a second appeal by the government would undoubtedly have followed. Thus there is no gain in judicial economy from the forfeiture rule advanced by the government. Moreover, although the Rule states that a defendant *may* assert error in a *conditional* denial on appeal, nothing in the Rule states that a defendant *must* raise the *absence* of a conditional ruling on pain of forfeiting the right to have a motion for new trial considered on the merits. The right to a new trial where the interests of justice so require—a right which antedates the Constitution itself—must weigh in the balance of our construction of Rule 29(d). *See* ORFIELD'S CRIMINAL PROCEDURE UNDER THE FEDERAL RULES § 33:5 at 283 (2d ed. 1987) ("The right to move for a new trial, and to have the motion considered upon the reasons presented for it, is an absolute one, and the granting or refusal thereof does not rest in the discretion of the court.") (quoting *Ogden v. United States*, 112 F. 523, 525 (3d Cir.1902)).

### III. THE MOTION FOR NEW TRIAL

#### A. Standard of Review

 As we noted above, "[a] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *Alston,* 974 F.2d at 1211 (citation omitted). The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses. *Id.* Given the procedural posture of this case, the scope of the district court's discretion bears elaboration:

"If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980). *Our role is limited to determining whether* the district court "clear[ly] and manifest[ly]" abused its discretion. *Id.* The decision "is within the sound discretion of the district court, and the appellant carries a significant burden to show" an abuse of discretion. *United States v. Steel,* 759 F.2d 706, 713 (9th Cir.1985).

Appellate deference makes sense. Circuit judges, reading the dry pages of the record, do not experience the tenor of the testimony at trial. The balance of proof is often close and may hinge on personal evaluations of witness demeanor. And, because an order directing a new trial leaves the final decision in the hands of the jury, it does not usurp the jury's function in the way a judgment of acquittal does. In fact, until 1984 grants of new trial motions were not appealable. Although they now are, a court of appeals will only rarely reverse a district judge's grant of a defendant's motion for a new trial, and then only in egregious cases.

*Id.* at 1211–12 (emphasis added) (citations omitted).[15]

to have the motion considered upon the reasons presented for it, is an absolute one, and the granting or refusal thereof does not rest in the discretion of the court.") (quoting *Ogden v. United States,* 112 F. 523, 525 (3d Cir. 1902)).

Tracking the government's argument, the dissent contends that it was Kellington's burden to raise the district court's failure to enter a conditional ruling. The dissent offers no authority for the proposition, no explanation why the defendant, as the prevailing party on a motion for judgment of acquittal, is obliged to raise the district court's plain error in failing to indicate how it would rule on the motion for new trial. As we noted above, nothing in Rule 29(d) requires this conclusion, and the interests underlying Rule 33 would be disserved by adopting it. We charge the government with failing to raise the issue in *Kellington I* for the simple reason that the government now asks this court (for the first time) to apply the requirements of Rule 29(d) to prevent a new trial which the district court has already deemed necessary to prevent a miscarriage of justice. If the government wished to preclude this eventuality, it should have raised the district court's failure to enter a conditional ruling on the

motion for new trial with the district court, *see Ghanayem,* 845 F.Supp. at 565–66, or on its appeal in *Kellington I.* In short, the discretionary rule in *United States v. Nagra,* 147 F.3d 875, 882 (9th Cir.1998) ("When a party could have raised an issue in a prior appeal but did not, a court later hearing the same case need not consider the matter.") (citing *United States v. Wright,* 716 F.2d 549, 550 (9th Cir.1983)), which the dissent would invoke against Kellington, applies with equal if not greater force to the government in this case.

**15.** The government argues that, although the grant of a motion for new trial is reviewed for abuse of discretion, the grounds for granting the motion in this case must be reviewed under the plain error standard because Kellington did not make contemporaneous objections to the district court's rulings on the ethics testimony. *See* Fed.R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). We decline the government's invitation to apply a bifurcated standard of review. The parties' dispute over the admissibility, relevance, and scope of the expert testimony was before the

## B. Merits

The obstruction of justice charge against Kellington has three elements: first, that Kellington "knowingly engaged in misleading conduct toward" Norm Young, second, that he did so "with intent to alter, destroy, mutilate, or conceal an object," and third, that he intended "to impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(b)(2)(B). This is a specific intent crime, so in the absence of an instruction on deliberate ignorance, the government was obliged to establish that Kellington knew the property Young removed/destroyed was useful to an official proceeding and that Kellington intended to impair the availability of those objects for use in the proceeding. Moreover, as 18 U.S.C. § 1515(c) provides, and as the jury was instructed, the chapter covering obstruction of justice "does not prohibit or punish the providing of lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding." Thus § 1515(c) provides a complete defense to obstruction of justice.

It is well settled that in the prosecution of a lawyer for conduct stemming from his or her representation of a client, expert testimony on the lawyer's ethical obligations is relevant to establish the lawyer's intent and state of mind. *See, e.g., United States v. Cavin,* 39 F.3d 1299, 1309 (5th Cir.1994) (reversing conviction of attorney for fraud where district court excluded testimony of expert on professional responsibility; "[A] lawyer accused of participating in his client's fraud is entitled to present evidence of his professional, including ethical, responsibilities, and the manner in which they influenced him. Exclusion of such evidence prevents the lawyer from effectively presenting his defense.") (citation omitted); *United States v. Kelly,* 888 F.2d 732, 743 (1989) (reversible error to exclude testimony regarding attorney's understanding of his professional obligations where attorney was charged and convicted of conspiracy to possess and counseling possession of cocaine in connection with representation of drug traffickers; "[T]he excluded testimony was very relevant to [the attorney's] intent and state of mind regarding his dealings with both [his client and an informant]. Kelly's duty of attorney-client confidentiality, combined with his duty to counsel his clients against committing further crimes, forms the basis for his primary defense: that he acted not with criminal intent but within the legitimate bounds of legal representation. The proffered testimony was thus crucial to

district court before, during and after the trial. Before trial, the government moved *in limine* to exclude Jarvis' testimony altogether, or in the alternative, to restrict the scope of his testimony to "ethical standards and criteria" rather than the ultimate question of Kellington's intent. The district court denied the motion. At trial, defense counsel's opening statement announced that an ethics expert would testify to establish the relationship between Kellington's conduct on behalf of MacFarlane and his obligations as an attorney. Kellington testified about his ethical obligations, Jarvis and the government's expert both testified, and it was obvious that both sides planned to address the ethical issues and evidence in closing arguments. Immediately after the ethics testimony, however, the district court unilaterally instructed the jury that the ethics testimony was mere background information. Finally, during a colloquy on the jury instructions, defense counsel asked the court to clarify the standard instruction that lawyer's comments and arguments at trial are not evidence by changing the reference from "lawyers" to "*trial* lawyers" so the jury would not think the instruction applied to the testimony of the experts. The district court agreed to the change, but then unilaterally ruled that it would not allow argument on the ethics testimony. In reviewing the motion for new trial, the district court applied a heightened standard of review, but it specifically noted that "[i]t may be that defendant sufficiently preserved his objection at trial that a plain error finding is not required." We agree. *Cf. United States v. Lui,* 941 F.2d 844, 846 (9th Cir.1991) ("A pretrial motion. *in limine* preserves for appeal the issue of admissibility of that evidence if the substance of the objection has been thoroughly explored during the hearing and the district court's ruling permitting introduction of evidence was explicit and definitive.") (citing *Palmerin v. City of Riverside,* 794 F.2d 1409, 1413 (9th Cir.1986)).

Kelly's defense, and its exclusion substantially hindered him from articulating this defense.").[16]

In this case, the defense relied heavily on the ethics testimony for two primary purposes. In order to prove the first element of the offense (knowingly misleading another), the government pointed to Kellington's initial call to Young and his failure to tell Young that "Parker" was an alias and that MacFarlane was a convicted drug trafficker and federal fugitive. In response, the defense used Jarvis to establish that any information Kellington omitted about MacFarlane in his initial call with Young was covered by his duty of confidentiality to MacFarlane. (Recall that Kellington testified he made a habit of not disclosing his clients' problems to third parties.) If Kellington was obliged not to reveal his client's secrets, which in Oregon includes any information "the disclosure of which would be embarrassing or ... detrimental to the client," Or.Code of Prof. Resp. Disciplinary Rule 4–101(A),[17] then he was simply obeying his ethical obligations when he told Young only so much as was necessary to have him execute the list of instructions.

Second, because there was no direct evidence of Kellington's mental state, the government asked the jury to infer from the overall circumstances that Kellington must have known MacFarlane was asking him to assist in the destruction and con-

cealment of objects useful to an "official proceeding." Kellington's repeated claim on the stand was that he simply did not know or suspect at the time that he was being asked to do anything other than wind up the business affairs of a former client who had no plans to contest his prior conviction and, in fact, expected to return to Vermont to serve out his sentence. On this point, Jarvis testified that so long as a lawyer does not affirmatively know his client's objectives to be illegal, the lawyer is obliged by the duty of loyalty and zealous representation to carry out his client's wishes. *See* Or. DR 7–101(A)(1) ("A lawyer shall not intentionally fail to seek the lawful objectives of the lawyer's client through reasonably available means permitted by law and these disciplinary rules except as provided by DR 7–101(B).").[18]

■ By instructing the jury that the experts' testimony was merely "background" information, and by preventing counsel from arguing the importance of the testimony in closing, the district court effectively rendered the experts' opinions nugatory despite the fact that such evidence was obviously relevant to negate criminal intent and/or to establish a "bona fide legal representation" defense under § 1515(c). The evidence of Kellington's ethical obligations was not only admissible and relevant to the question of his intent, Kellington had a fundamental right under

---

**16.** As the *Kelly* court noted, "[o]ther circuits have also upheld the relevance of professional standards for attorneys where offered by the Government to help prove criminal intent on the part of lawyer-defendants. *It would be incongruous to admit such evidence when tendered in support of guilt, but not when offered for exculpatory purposes.*" 888 F.2d at 744 (emphasis added) (citing *United States v. Machi,* 811 F.2d 991, 999–1000 (7th Cir.1987); *United States v. Klauber,* 611 F.2d 512, 520 (4th Cir.1979); *United States v. Rabbitt,* 583 F.2d 1014, 1028–29 (8th Cir.1978)). *See also* Julia Evans Guttman, *Defending Lawyers on Trial,* 11 Crim. Just. 3 (1996) (discussing other lawyer-defendant cases in which ethics expert testimony was admitted and noting how readily a lawyer's performance of certain ethical obligations may appear suspicious to a

jury or as evidence of concert with client's illicit ends).

**17.** *See also* O.R.S. § 9.460(3) ("An attorney shall maintain the confidences and secrets of the attorney's clients consistent with the rules of professional conduct...." ).

**18.** DR 7–101(B) provides that "a lawyer may refuse to aid or participate in conduct that the lawyer believes to be unlawful even though there is some support for an argument that the conduct is legal."

Jarvis also opined that Kellington's conduct on Sunday was entirely consistent with his duty to preserve his client's assets and take possession of evidence.

the Sixth Amendment to present his theory of the case in closing arguments. *See Herring v. New York,* 422 U.S. 853, 858, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) ("The right to the assistance of counsel has thus been given a meaning that ensures to the defense in a criminal trial the opportunity to participate fully and fairly in the adversary factfinding process. There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial. Accordingly, it has universally been held that counsel for the defense has a right to make a closing summation to the jury...."); *Conde v. Henry,* 198 F.3d 734, 739 (9th Cir.1999) ("Although a court may limit arguments that are unduly time consuming, 'stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial,' *denying an accused the right to make final arguments on his theory of the defense denies him the right to assistance of counsel ....* By preventing [petitioner] from arguing that no robbery had occurred and that he lacked the requisite intent to rob, the trial court's order violated the defendant's fundamental right to assistance of counsel and right to present a defense, and it relieved the prosecution of its burden to prove its case beyond a reasonable doubt.") (quoting *Herring,* 422 U.S. at 862, 865, 95 S.Ct. 2550). The district court's decision to preclude ethics argument at closing violated this right.

The government's theory of criminal intent was that any reasonable person, and especially an attorney, would have known he was being asked to impair the availability of objects for use in an official proceeding. In its closing argument, the government pursued two strategies which made it essential for the defense to have the freedom to argue the ethical issues. First, the government repeatedly asked the jury to infer Kellington's criminal intent by using "common sense." Viewing the circumstances from the perspective of common sense, the prosecution contended, no one could fail to recognize that MacFarlane was asking to have evidence destroyed or concealed.[19] This argument reduced complex questions regarding the special obligations of the attorney-client relationship (and Kellington's awareness of those obligations) into matters of "common sense." It also reinforced the district court's erroneous instruction that the ethics testimony was simply background information, rather than evidence relevant to the question of Kellington's mental state.

■ Second, flatly disregarding the court's order not to make ethics arguments in closing, the government repeatedly invited the jury to infer criminal intent on the part of Kellington from the fact that he did not follow his "duty to investigate"—implying incorrectly from the expert testimony that such a duty unequivocally exists once a lawyer discovers a client has lied.[20] The government also implied that Kellington had no ethical duty to withhold information of any kind from Young in the

**19.** After noting that Young suspected foul play from the outset, government counsel argued:
> You see, Mr. Young is not as sophisticated, of course, as Mr. Kellington. He hasn't been practicing law for 30 years. But common sense tells you what when someone tells you to destroy something, or hide something, or remove something when someone is in jail? This is not a complicated issue? Oh, it can be made to be complicated. But Ladies and Gentlemen of the jury, stop for a second and think about it using your own common sense.

RT III 225.

**20.** The government argued:

> Well, I suppose in Mr. Kellington's case he would say, I was misled or tricked by my client, because I trusted him under my duty to believe him. That duty, by the way, which two experts talked about, seems to apply as long as your client isn't lying to you. But once you've caught your client in a lie, any person—attorney or otherwise—would seem to have at least the common sense to realize, I should be more cautious about the next statement this person makes to me. Or at least I have a duty to investigate.

RT III 224.

initial call.[21] These arguments not only obfuscated the relationship between Kellington's intent and his ethical obligations, it allowed the government to place its spin on the expert's testimony despite the district court's order.

By obeying the court's order precluding argument that ethical obligations dictated Kellington's conduct, on the other hand, counsel for Kellington was unable to frame and give content to the core of his defense—that Kellington was attempting (however imprudently in hindsight) to provide his client with bona fide legal representation, and that much of the conduct from which the government would have the jury infer criminal intent can be explained by his ethical obligations to MacFarlane, his background and experience, and the nature of the attorney-client relationship. Combined with the court's instruction to the jury that the ethics testimony was merely background information, we can have no confidence that the jury gave due regard to the ethics evidence in assessing the government's largely circumstantial case against Kellington on the question of criminal intent. Accordingly, we affirm the district court's considered judgment that, "the evidence convicting Kellington of a violation of 18 U.S.C. § 1512(b)(2)(B) in conjunction with the court's restrictions on closing argument preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."

In short, there was no abuse of discretion in granting Kellington's motion for new trial. Indeed, we owe special defer-ence to the district court's evaluation of the testimony at trial (especially Kellington's) in its conclusion that the evidence preponderates sufficiently heavily against the verdict to merit re-trial.

**AFFIRMED AND REMANDED FOR FURTHER PROCEEDINGS.**

TASHIMA, Circuit Judge, dissenting:

On the first appeal, we reversed the district court's decision granting Kellington's motion for judgment of acquittal, and "REMANDED FOR ENTRY OF JUDGMENT AND FOR SENTENCING." *United States v. Kellington,* 1998 WL 75695, *3 (9th Cir. 1998) (*Kellington I* ). On remand, Kellington renewed both his motion for a judgment of acquittal and his motion for a new trial. The district court denied Kellington's renewed motion for judgment of acquittal, but granted his renewed motion for a new trial. Because, in my view, the district court acted outside the scope of the mandate by granting Kellington's motion for a new trial, I dissent from the majority's affirmance of that order.

The district court's compliance with a mandate is assessed by the rule of mandate. *See United States v. Cote,* 51 F.3d 178, 181 (9th Cir.1995). We have described the rule of mandate as similar to, but broader than, the law of the case doctrine. *See id.* (citing *Herrington v. County of Sonoma,* 12 F.3d 901, 904 (9th Cir. 1993)). Under this rule, "[a] district court, upon receiving the mandate of an appellate

---

21. The government argued:

[H]e didn't have to break attorney-client privilege. All he had to do was tell [Young] what he knew from Deputy Marshal Smoot.... Now, if Mr. Kellington had just simply told him what the marshal told [him].... And simply said, Norm, guess what? You know, Richard Parker? He's not Richard Parker. He's Peter MacFarlane. The marshals have got him. They've got him in jail. And he was—he's wanted in Vermont. And you'll never believe this. Guess what? It was on drug smuggling or something to do with drug trafficking. And by the way, Richard asked me to tell you [to remove and destroy his property].... If Mr. Kellington had been honest with Mr. Young ... then, Ladies and Gentlemen of the jury, common sense tells you what? Common sense would have been Mr. Young says, I want no part of this.

Why didn't Mr. Kellington tell Mr. Young the whole truth and nothing but the truth, instead of just bits and pieces? Never even telling that the identity isn't true.

RT III 226–28.

court 'cannot vary it or examine it for any other purpose than execution.'" *Id.* (quoting *In re Sanford Fork & Tool Co.,* 160 U.S. 247, 255, 16 S.Ct. 291, 40 L.Ed. 414 (1895)). Thus, "a district court could not refuse to dismiss a case when the mandate required it." *Id.* (citing *Stamper v. Baskerville,* 724 F.2d 1106, 1107–08 (4th Cir. 1984)). Likewise, a district court may not decline to enter judgment for a party when the mandate so directs. *See Nguyen v. United States,* 792 F.2d 1500, 1501–03 (9th Cir.1986) (holding that in case remanded "for entry of summary judgment in favor of the government" district court erred in failing to so enter judgment).

While it is true that the district court may act on "matters left open by the mandate," *Caldwell v. Puget Sound Elec. Apprenticeship and Training Trust,* 824 F.2d 765, 767 (9th Cir.1987) (quoting *Sanford Fork,* 160 U.S. at 256, 16 S.Ct. 291), here, the mandate left no matter open. The mandate was clear and unequivocal: it reversed the judgment of acquittal, and remanded for entry of judgment and sentencing. Where the mandate directs the entry of judgment, it is error for the district court to fail to so enter judgment. *See Nguyen,* 792 F.2d at 1501–03. Here, the language of the mandate—the remanding for entry of judgment and sentencing—does not leave open the alternative of granting Kellington a new trial on remand. *See Stamper,* 724 F.2d at 1108 ("Nor do we believe that *In re Sanford* should be read to permit a lower court to treat an issue not before the appellate court as 'a matter left open.'") (citation omitted).

Kellington contends that his case falls within the rule that "unless the reversing court indicates in its mandate or opinion that a retrial is prohibited because of double jeopardy or a similar infirmity, a second trial is appropriate." *Cote,* 51 F.3d at 182. This argument is without merit.

That rule speaks to the circumstances, present in *Cote,* where the appellate court reverses a jury conviction, but omits an explicit order remanding the cases for further proceedings. *See id.* at 180. Here, in contrast, *Kellington I* reversed a judgment of acquittal after the jury had rendered a guilty verdict and the mandate specifically directed the entry of judgment and sentencing. Accordingly, the rule Kellington attempts to invoke has no application here.

The majority cites a number of cases discussing the general principle of the rule of mandate; however, none is directly controlling. And, in applying that rule to this case, the majority ignores the controlling case directly on point. This case is directly controlled by *Nguyen,* which holds expressly that when, as here, the mandate directs the entry of judgment, it is error to fail to so enter judgment. *See* 792 F.2d at 1501–03; *see also Sanford Fork,* 160 U.S. at 255, 16 S.Ct. 291 ("a district court could not refuse to dismiss a case when the mandate required it").

The majority also makes much of the fact that in *Kellington I,* "neither party briefed or otherwise raised the district court's failure to enter a conditional ruling on the motion for new trial." Maj. Op. at 1092. *See also id.* at 1094–95 ("the motion for new trial was not before the *Kellington I* court"). The majority even goes so far as to speculate that the prior panel "was not then aware of the mooted new trial motion."[1] Maj. Op. at 1092.

The Federal Rules of Criminal Procedure provide:

> If a motion for judgment of acquittal after verdict of guilty under this Rule is granted, the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed, specifying the grounds for such determination. If the motion for a new

---

**1.** Considering this court's practice of ordering up the entire district court file, it would make more sense to speculate that the prior panel *was* aware of the motion for new trial, rather than to speculate that it was not. In the end, however, this makes no difference because, as explained below, Kellington's failure to raise this issue means that he has waived it.

trial is granted conditionally, the order thereon does not affect the finality of the judgment. If the motion for a new trial has been granted conditionally and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. If such a motion has been denied conditionally, the appellee on appeal may assert error in that denial, and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

Fed.R.Crim.P. 29(d). After granting Kellington's motion for judgment of acquittal, in spite of the requirement of Rule 29(d) that it conditionally rule on the motion for a new trial, the district court denied Kellington's motion for a new trial on the ground that it was moot, without reaching its merits.

Kellington did not move to have the denial of his motion for a new trial reconsidered, despite the fact that Rule 29(d) specifically provides that, if the district court grants a motion for judgment of acquittal, "the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed, specifying the grounds for such determination." *Id.* Neither did Kellington appeal from the denial of his motion for a new trial as moot, nor did he, as appellee in the government's appeal, "assert error in that denial" of his motion for a new trial, as he had the right to do under Rule 29(d).[2]

Kellington knew that the district court had denied his motion for a new trial as moot, instead of reaching its merits and making a conditional ruling thereon. He had the right to raise this erroneous ruling either as the appellee in the government's appeal or to file a cross-appeal, but he did neither. Kellington's failure to raise this issue on the first appeal waived it.[3] *See American Ad Management, Inc. v. General Tel. Co.*, 190 F.3d 1051, 1054 n. 2 (9th Cir.1999) ("American waived its other antitrust claims in its prior appeal when it did not challenge their dismissal by the district court."); *see also SIPC v. Vigman*, 74 F.3d 932, 937 (9th Cir.1996) (holding that a party cannot revisit issues that it abandons on appeal). That waiver is the reason *Kellington I* did not address the issue; because Kellington did not raise it. *Id.* Not having raised it when he could and should have, Kellington has waived it. Thus, the fact that *Kellington I* did not address this issue does not mean it is not foreclosed by *Kellington I* 's mandate; on the contrary, it is foreclosed, just as any other issue that could have been raised on the first appeal is foreclosed. *See United States v. Nagra*, 147 F.3d 875, 882 (9th Cir.1998) ("When a party could have raised an issue in a prior appeal but did not, a court later hearing the same case need not consider the matter.").

Few precepts are more fundamental to the operation of a hierarchically structured judiciary than that the mandate of a higher court is "controlling as to the matters within its compass." *Sprague v. Ticonic*

2. The majority, in effect, holds that the government cannot raise non-compliance with Rule 29(d) for the first time on appeal. *See* Maj. Op. at 1096–97 & n. 14. The government, however, was not required initially to raise it. As explained above, it was Kellington's obligation to raise it *on the first appeal.* Moreover, the argument inheres in the dictate of the mandate. Even assuming that the government had the obligation initially to raise it, this would be an appropriate case in which to consider the argument, regardless of the government's failure to do so. The rule is one of discretion, *see Citibank (South Dakota), N.A. v.*

*Eashai (In re Eashai),* 87 F.3d 1082, 1085 n. 2 (9th Cir.1996), and the issue is purely a legal one, requiring no further development of the record. *See RTC v. First Am. Bank,* 155 F.3d 1126, 1129 (9th Cir.1998).

3. The majority also appears to hold that the rule of mandate cannot be applied unless "the *Kellington I* court [at least] implicitly disposed of the merits of the motion for new trial." Maj. Op. at 1094 (citation omitted). As explained above, however, Kellington's waiver of this issue made it unnecessary for the *Kellington I* panel to address it.

*Nat'l Bank,* 307 U.S. 161, 168, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). The majority's construction, besides being directly contrary to controlling precedent, considerably weakens the rule of mandate. I respectfully dissent because the district court erred in failing to follow the mandate in *Kellington I,* which required it to enter judgment and to sentence Kellington. I would reverse the district court's order granting Kellington's renewed motion for a new trial and remand for the entry of judgment and sentencing, as required by the mandate in *Kellington I.*[4]

**4.** Because I would reverse the district court's order on the ground that it violates the rule of mandate, I would not reach the merits of Kellington's motion for a new trial.